UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                      :

HELIO GUSMAO, <u>et al.</u>,                        :

                                   :

                 <u>Plaintiffs</u>,          :

                                   :         06 Civ. 5113 (GEL)

      -against-                 :

                                   :         **OPINION AND ORDER**

GMT GROUP, INC., <u>et al.</u>,             :

                                   :

                 <u>Defendants</u>.        :

                                   :
-------------------------------------------------------------x

Richard J.J. Scarola, Paul S. Ellis, and Alexander
Zubatov, Scarola Ellis LLP, <u>for plaintiffs</u>.

Jason Halper and Karim Kaspar, Lowenstein
Sandler PC, <u>for defendants</u>.

GERARD E. LYNCH, <u>District Judge</u>:

      This dispute arises from an alleged breach of the contract governing the sale of Vigo

Remittance Corporation ("Vigo"), an international money transfer service provider. Upon the

completion of discovery, plaintiffs, who sold the company to defendants, again move for

summary judgment and a declaration that they are entitled to the full release of certain funds held

in escrow and blocked by defendants purportedly according to the terms of the contract. For the

following reasons, plaintiffs' motion for summary judgment will be granted in part and denied in

part.

# BACKGROUND[1]

## I.     Sale of Vigo

On December 18, 2002, Helio Gusmao, Flavio Newlands Moniz Freire, and Ivan
Newlands Moniz Freire, full owners of Vigo and plaintiffs in this action, sold most of their
interest in Vigo to GMT Group, Inc., and Global Money Transfers, Inc., (collectively, "GMT" or
"defendants") in exchange for $76.5 million and stock in GMT.  (See D. Rule 56.1 Stmt. ¶ 5;
Declaration of Alexander Zubatov, dated January 25, 2008, ("Zubatov Decl.") Ex. D Stock
Contribution Agreement, ("SCA").)  The sale closed on March 31, 2003.  (D. Rule 56.1 Stmt.
¶ 6.)  Pursuant to the SCA, GMT held approximately five million dollars of the purchase price in
escrow (id. ¶ 7) against plaintiffs' promise to indemnify GMT for breaches of certain contractual
warranties (SCA § 10.2).

## II.     Funds in Escrow

After the sale, GMT claimed indemnification rights against the escrow, preventing any
funds from being released to plaintiffs.  By letter dated September 29, 2004, GMT asserted five
separate claims for indemnification totaling more than $15.5 million.  (Zubatov Decl. Ex. DD.)
Four of the five claims involved lawsuits brought by third parties against Vigo: the first claim,
for more than seven million dollars, relating to a class action lawsuit in California ("McCann
claim"); the second claim, for more than four million dollars, relating to a civil lawsuit in New
York City by a former Vigo correspondent for unpaid commissions ("Dannyjoe claim"); the

---

[1]  Since plaintiffs move for summary judgment, the Court makes no factual findings, but
views the facts in the light most favorable to GMT, the nonmoving party.  Therefore, except as
otherwise noted, the facts discussed are either undisputed or presented in the light most favorable
to GMT.

third claim, for $1.8 million, relating to a breach of contract action in Canada ("Commonwealth claim"); and the fourth claim, for $1.5 million, by a former Vigo employee for unspecified damages ("Valencia claim"). (Id.) The fifth claim, for "at least" $1.1 million, related to damages allegedly suffered by Vigo because its Brazilian correspondent – the entity that effectuated the payment of funds to the intended beneficiaries in Brazil – was allegedly improperly licensed under Brazilian law, thereby forcing Vigo to terminate that relationship "in order to comply with U.S. law" ("Brazil claim"). (Id.)

As of June 2006, GMT had refused to release any funds, and more than $4.9 million still remained escrowed.[2] Plaintiffs then brought this action, seeking a declaration that they were entitled to the release of at least a portion of those blocked funds. (Compl. ¶¶ 47, 56; see also Am. Compl. ¶ 57.) Plaintiffs claim that GMT has refused to release the funds without any legitimate basis for doing so, thereby violating the terms of the parties' agreement. GMT, in turn, counterclaimed, asserting that plaintiffs breached their contractual warranties and negligently misrepresented to GMT that Vigo's correspondent was properly licensed to conduct money transfer transactions in Brazil, and seeking a declaratory judgment that GMT is entitled to at least $1.1 million of the amount held in escrow. (Countercl. ¶¶ 13, 17, 20; see also Am. Countercl. ¶ 3.)

On February 2, 2007, before the completion of discovery, plaintiffs moved for summary judgment dismissing GMT's counterclaims and declaring that all escrowed funds be released to them. The Court denied that motion on June 6, 2007, without prejudice to any similar motion to

---

[2] Pursuant to a settlement agreement dated June 5, 2006, plaintiffs released approximately $66,000 to GMT. (Compl. ¶ 23 n.1.)

be filed after the close of discovery.  (See Order of June 11, 2007.)  Discovery having been

completed, plaintiffs again move for summary judgment.  What were initially four claims valued

by GMT at $14.45 million have essentially melted away.[3]  The Brazil claim is now the only

outstanding claim of those GMT initially asserted, and the only possible justification that GMT

has for blocking release of the escrowed funds to plaintiffs.  (D. Rule 56.1 Stmt. ¶ 23.)

GMT initially valued the Brazil claim at $1.1 million, but in March 2007 (after all or

most of the other justifications for retaining the full escrow disappeared), the purported value of

the claim ballooned to more than $5.2 million.  (Zubatov Decl. Ex. F, Declaration of Karin

Gillies, dated March 16, 2007, ¶ 6.)  GMT's expert report dated January 4, 2008, now concludes

that GMT's damages are closer to $1.4 million, constituting lost profits from unrealized money

transfer transactions between October 1, 2003, and October 31, 2005.  (Declaration of Jason

Halper, dated March 10, 2008, ("Halper Decl.") Ex. H, Report of David J. Zaumeyer, dated

January 4, 2008, ("Zaumeyer Rep.") ¶ 11.)  In their current papers, GMT contends that the value

of the Brazil claim is "roughly" two million dollars (D. Opp. 24 n.4), and apparently has agreed

to release all but two million dollars of the escrowed funds to plaintiffs (see D. Rule 56.1 Stmt.

¶ 19).  Plaintiffs insist that they are entitled to that remaining two million dollars.

III.    Brazil Claim

Understanding the Brazil claim requires understanding the basic process by which Vigo

transferred money to Brazil.

---

[3] In September 2006, the Dannyjoe claim settled for $35,000, and GMT concedes that
there is now no basis for retaining any funds relating to the claim.  (D. Rule 56.1 Stmt. ¶ 17.)
GMT also withdrew its reliance on the Commonwealth claim, which had been twice dismissed.
(Id. ¶ 21.)  The record is unclear regarding the exact disposition of the McCann and Valencia
claims, but GMT no longer considers either a basis for blocking the escrow.  (See id. ¶ 23.)

A.   Structure of Money Transfers

To use Vigo's services, a customer entered a Vigo branch in the United States and identified the intended recipient of the funds transfer, providing the recipient's name and banking information.  (D. Rule 56.1 Stmt. ¶ 25.)  Vigo then transferred that information to its Brazilian correspondent, which would effect the transfer into the paying bank.  (Id.; Zubatov Decl. Exs. N-P.)  The customer paid an up-front fee for the service, and the recipient received Brazilian reais in accordance with the "retail" exchange rate for dollars.  (D. Rule 56.1 Stmt. ¶ 26.)  Those effecting the transfer profit both through the up-front fee paid by the person sending the money and through capture of the "FX spread," which is the difference between the retail and wholesale exchange rate.[4]  (Id.  ¶¶ 26-27.)

B.   Vigo's Brazilian Correspondent

At the time of the sale, Vigo dealt exclusively with Vigo do Brasil Cambio e Turismo Ltda., predecessor of Politiburo Cambio e Turismo, Ltda. (collectively "Politiburo").  (Zubatov Decl. Ex. I, Deposition of Helio Gusmao, dated August 7, 2007, ("Gusmao Dep.") 38; id. Exs. N-P; D. Rule 56.1 Stmt. ¶¶ 38, 40.)  Politiburo, an "exchange house" (Gusmao Dep. at 36; D. Rule 56.1 Stmt. ¶ 55), operated exclusively in Brazil's black market.[5]  Before the Vigo sale

---

[4] Assuming that the retail exchange rate is 1.01 dollars to 1 real, and the wholesale exchange rate is 1 dollar to 1 real, a customer given the retail exchange rate would receive 10,000 reais in exchange for 10,100 dollars.  In contrast, the money transferor would receive 10,100 reais in exchange for 10,100 dollars, and would retain $100 (or 100 reais) by virtue of the foreign exchange "spread," in addition to receiving its fee.

[5] Although plaintiffs often characterize it as a "non-official" or "parallel" market, they have also characterized it as a black market.  (See Zubatov Decl. Ex. T.)  Since a reasonable factfinder could characterize it as a black market, the Court adopts that inference for the purposes of this motion.  The reasons why Politiburo's operations could be seen as illicit are discussed below.

closed, Politiburo and Vigo entered into a contract formalizing their relationship.  (See Zubatov Decl. Exs. O & P; P. Mem. 10 n.9.)  The agreement, initially effective for one year, would be "automatically renewed for an additional one-year term commencing on the anniversary of [March 12, 2003, the date the agreement was signed,] unless either party ha[d] notified the other in writing, not less than 60 days before any such anniversary date, of its intention to cancel the agreement."  (Zubatov Decl. Ex. P § 8(a).)[6]

The relationship between Vigo and Politiburo was not without its difficulties.  In around September 2003, GMT discontinued making dollar payments in Brazil through Politiburo in order to comply with Brazilian regulations.  (Zubatov Decl. Ex. M, Deposition of Roger Timm, dated Oct. 24, 2007, ("Timm Dep.") 81-82, 117-18; id. Ex. K, Deposition of Jorge Guerrero, dated Oct. 30, 2007, ("Guerrero Dep.") 31-36.)  By letter dated February 27, 2004, Politiburo informed Vigo that, as of April 30, 2004, it would cease to serve as Vigo's payee in Brazil.  (Zubatov Decl. Ex. Z.)  Shortly thereafter, on March 8, 2004, Vigo's compliance officer Jorge Guerrero recommended to the board of GMT and Vigo that Vigo terminate Politiburo as Vigo's correspondent for compliance reasons.  (Zubatov Decl. Ex. BB.)  Guerrero based his recommendation in part on Politiburo's "lack of confirmation of compliance, compounded by the results of our assessment of risks presented by continued remittance services through Politiburo."  (Id.)  The board accepted that recommendation, and by letter dated March 18, 2004, Vigo informed Politiburo that Vigo would terminate its remittance service to Brazil through

---

[6] The record contains two apparently identical agreements, one dated January 9, 2003, and another dated March 12, 2003.  (Zubatov Decl. Exs. O & P.)  GMT claims that the March 12, 2003, contract governs (see D. Rule 56.1 Stmt. ¶ 41), and since a reasonable factfinder could accept that claim, the Court adopts that position for the purposes of this motion.

Politiburo on March 19, 2004, the day Vigo faxed the letter to Politiburo (Halper Decl. Ex. G),

and approximately forty days before Politiburo was to cease operations of its own accord.  Vigo

had recently (or very soon thereafter) initiated correspondent services with Bradesco, a licensed

correspondent affiliated with Bank of America.  (Zubatov Decl. Ex. J; see also D. Rule 56.1

Stmt. ¶ 75.)  As an independent report detailing Vigo's compliance explained:

> In February 2004, Vigo initiated correspondent services in Brazil
> with Bradesco, through Bank of America.  Bradesco holds the
> proper license from the Central Bank in Brazil.  Immediately upon
> securing the Brazil payment platform, Vigo closed all
> correspondent activity with all casas de cambio and other financial
> services businesses in Brazil not licensed by the Central Bank.
> This took place in March 2004.

(Zubatov Decl. Ex. J.)

C.    Sellers' Warranties

GMT claims that it is entitled to retain the escrowed funds because plaintiffs breached

their contractual warranties.  Pursuant to the SCA, plaintiffs, as sellers, warranted the "full

compliance" of "each Acquired Company and, to Vigo Stockholders' Knowledge, each of the

Acquired Companies' respective Affiliates and Representatives (other than the Agents or the

Correspondents)" with various laws and legal requirements.  (SCA § 3.14(a)(i).)  Plaintiffs also

warranted that "to [their] [k]nowledge, no . . . circumstance exist[ed] that . . . could reasonably

be expected to constitute or result in a violation" by Vigo of various laws and legal requirements.

(Id. § 3.14(a)(ii).)  Under the contract, Politiburo is a correspondent, as it is a "foreign bank[] or

other foreign Person[] or financial institution[] to which [Vigo] transmits money."  (Id. § 1.)[7]

---

[7] "Agents" are "Persons, other than [Vigo], that receive money for transmission from the
public on behalf of [Vigo]."  (SCA § 1.)

IV.    Parties' Contentions

GMT claims that plaintiffs breached these warranties because Politiburo "was not properly licensed under Brazilian law," and "[i]n order to comply with U.S. law, Vigo terminated [Politiburo] following discovery that it did not hold proper licenses."  (Zubatov Ex. DD.)  Specifically, GMT claims that Vigo's use of Politiburo to effect money transfers to Brazil violated the laws of the United States, New York, and Brazil.  (D. Opp. 14; id. at 9.)  In turn, plaintiffs argue: first, that they as sellers never breached any warranties; second, that even if they did, those breached warranties never became a part of the parties' bargain; third, that assuming GMT was somehow damaged by Politiburo's improper licensing, those damages were not caused by plaintiffs; and lastly, that GMT can claim no damages, or in the alternative, no damages past April 30, 2004.  Plaintiffs also argue that they are entitled to summary judgment on GMT's claim of negligent misrepresentation.  Only the latter argument has merit.

**DISCUSSION**

I.    Legal Standards

A.    Summary Judgment

Summary judgment shall be granted if "there is no genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the nonmoving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  In deciding a motion for summary judgment, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in the light most favorable to the party opposing the motion," Cifarelli v.

<u>Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996), and does not make any credibility assessments or weigh the evidence, <u>Weyant v. Okst</u>, 101 F.3d 845, 854 (2d Cir. 1996).

      B.      <u>Breach of Warranty Under New York Law</u>

Under New York law, a breach of warranty claim sounds "essentially in contract." <u>CBS, Inc. v. Ziff-Davis Publ'g Co.</u>, 75 N.Y.2d 496, 503 (1990). To prevail, a party must establish the existence of a contract containing a bargained-for express warranty with respect to a material fact, reliance on that warranty, a breach of that warranty, and damages suffered as a result of the breach. <u>See</u> <u>Promuto v. Waste Mgmt., Inc.</u>, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999); <u>Ainger v. Mich. Gen. Corp.</u>, 476 F. Supp. 1209, 1220-21 (S.D.N.Y. 1979); <u>see</u> <u>also</u>, <u>CBS</u>, 75 N.Y.2d at 503. Reliance is required, but "[i]n contrast to the reliance required to make out a claim for fraud, the general rule is that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue." <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 186 (2d Cir. 2007). What matters is that "the express warranty was part of the bargained-for agreement." <u>Donald v. Shinn Fu Co. of America</u>, No. 99 Civ. 6397, 2002 WL 32068351, at *5 (E.D.N.Y. Sept. 4, 2002). The "critical question is not whether the buyer believed in the truth of the warranted information, as [the seller] would have it, but whether it believed it was purchasing the seller's promise as to its truth." <u>CBS</u>, 75 N.Y.2d at 503 (citations, internal quotation marks, and alterations omitted).

This particular conception of reliance mandates "fine factual distinctions in [New York's] law of warranties: a court must evaluate both the extent and the source of the buyer's knowledge about the truth of what the seller is warranting." <u>Rogath v. Siebenmann</u>, 129 F.3d 261, 264 (2d Cir. 1997). An injured party "must show that it believed that it was purchasing

seller's promise regarding the truth of the warranted facts." Merrill Lynch, 500 F.3d at 186 (citation omitted). Therefore, where a buyer "closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach . . . unless the buyer expressly preserves his rights under the warranties . . . ." Galli v. Metz, 973 F.2d 145, 151 (2d Cir. 1992); see also Merrill Lynch, 500 F.3d at 186. However, where the "seller is not the source of the buyer's knowledge, e.g., if it is merely 'common knowledge' that the facts warranted are false, or the buyer has been informed of the falsity of the facts by some third party, the buyer may prevail in his claim for breach of warranty." Rogath, 129 F.3d at 265. In such a situation, it is "not unrealistic to assume that the buyer purchased the seller's warranty 'as insurance against any future claims,' and that is why he insisted on the inclusion of the warranties in the bill of sale." Id., quoting Galli, 973 F.2d at 151. Therefore, "what the buyer knew and . . . whether he got that knowledge from the seller are critical questions." Rogath, 129 F.3d at 265.

      C.    <u>Negligent Misrepresentation</u>

Under New York law, a negligent misrepresentation claim sounds in tort. To succeed, a claimant must establish that its adversary had a "duty to use reasonable care to impart correct information due to a special relationship existing between the parties," that the information provided by the adversary was "incorrect or false," and that the claimant "reasonably relied upon the information provided." Fleet Bank v. Pine Knoll Corp., 736 N.Y.S.2d 737, 741 (3d Dep't 2002).

Whether a duty exists "is an issue of law for the courts." Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996). In the "commercial context, a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information." Id. (citation and internal quotation marks omitted, brackets in original). In the commercial context, "[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact" depending on whether the person making the representation had "unique or special expertise," whether "a special relationship of trust or confidence existed between the parties," and "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Id. at 264. However, this and other courts have recognized that "Kimmell did not represent a departure from the traditional understanding that a special relationship is required in order to state a claim for negligent misrepresentation." JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004).

Furthermore, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987); accord Fleet Bank, 736 N.Y.S.2d at 795 (citation and internal quotation marks omitted). In addition, at least some courts have held that the alleged damages must be more than "mere economic loss." Robehr Films, Inc. v. American Airlines, Inc., No. 85 Civ. 1072, 1989 WL 111079, at *2 (S.D.N.Y. Sept. 19, 1989) (citation and internal quotation marks omitted); see also Carmania Corp. v. Hambrecht Terrell Int'l, 705 F. Supp. 936, 938-39 & n.3 (S.D.N.Y. 1989) ("If the damages suffered are of the type remediable in contract, a

11

plaintiff may not recover in tort.").  As the Second Circuit has noted, "New York law holds that a negligence action seeking recovery for economic loss will not lie."  Suffolk County v. Long Island Lighting Co., 728 F.2d 52, 62 (2d Cir. 1984).

In sum, "[m]erely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim."  Clark-Fitzpatrick, 70 N.Y.2d at 390.  "If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort."  Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 899 (2d Cir. 1980).  Otherwise, "contract law would drown in a sea of tort."  East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866 (1986).

II.   Legal Standards Applied

A.   Breach of Warranty

Plaintiffs seek summary judgment on numerous grounds.  First, plaintiffs claim that they breached no warranty.  Second, they claim that their alleged warranties "never became a part of the parties' bargain" (P. Mem. 33), in other words, that GMT waived any contractual right it may have had to enforce the alleged warranty because plaintiffs disclosed to GMT before the deal closed that Politiburo and, by implication, Vigo were operating in Brazil's black market.  Third, plaintiffs claim that any alleged damages were not caused by plaintiffs' alleged breach, but by other independent causes.  Fourth, plaintiffs argue that GMT have no cognizable damages, or, in the alternative, no damages beyond April 30, 2004.  Each will be examined in turn, and, at this stage, all must be rejected.

1.    Broken Warranty

Plaintiffs first argue that they never warranted Politiburo's compliance. The sellers warranted the "full compliance" of certain entities "*other than* [Vigo's] . . . Correspondents," including Politiburo. (SCA § 3.14(a)(i), emphasis added.)[8] However, GMT insists that "by effecting money transfers to Brazil through a correspondent that was not properly licensed in Brazil, *Vigo itself* was violating both foreign and domestic laws." (D. Opp. 12; see also Zubatov Decl. Ex. DD.) Plaintiffs also contend that, at the time of the sale, Politiburo was in compliance with applicable law, and that, even had Politiburo been noncompliant, such noncompliance did not render Vigo noncompliant either as a matter of law or contract.

Plaintiffs' claims must fail at this stage because, notwithstanding their arguments to the contrary (see P. Mem. 21-22), a reasonable factfinder could conclude that Vigo's use of Politiburo violated federal law. Federal regulations required that by July 24, 2002,"money services business[es]" like Vigo[9] "develop, implement, and maintain an effective anti-money laundering program," meaning "one reasonably designed to prevent [Vigo] from being used to facilitate money laundering and the financing of terrorist activities." 31 C.F.R. § 103.125(a) & (e); see also 31 U.S.C. § 5318(h)(2) (authorizing the Secretary of Treasury to "prescribe

---

[8] Pre-closing, Vigo separately entered into an agreement with Politiburo in which Politiburo represented that it had "all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted and as proposed to be conducted in [Brazil] in accordance with this agreement" and "is authorized to effect money transmission payments to beneficiaries in [Brazil] in all locations wherein it conducts business and complies with all state and [Brazilian] laws and regulations applicable to such transmission." (Zubatov Decl. Ex. P. § 5(b)(i).)

[9] Money services businesses are defined to include entities "within the United States," 31 C.F.R. § 103.11(uu), "engaged as a business in the transfer of funds," id. § 103.11(uu)(5)(B).

minimum standards" for anti-money laundering programs).  A satisfactory anti-money laundering program must be in writing and be "commensurate with the risks posed by the location and size of" the business.  31 C.F.R. § 103.125(b)-(c).  "At a minimum," the program must "incorporate policies, procedures, and internal controls reasonably designed to assure compliance with" the regulations, id. § 103.125(d), and Vigo "remain[ed] solely responsible for implementation of the requirements set forth in th[e] section, and nothing in th[e] paragraph [setting out certain minimum standards for compliance] relieve[d] [Vigo] from its obligation to establish and maintain an effective anti-money laundering program," id. § 103.125(d)(iii).

By interpretive release dated December 14, 2004, the Department of Treasury noted that "an essential part of [a money transmitter's] existing obligation under 31 CFR 103.125" is the obligation "to include, as part of their anti-money laundering programs, procedures, policies, and controls to govern relationships with foreign agents and counterparties to enable the [money transmitter] to perform the appropriate level of suspicious activity and risk monitoring."  69 F.R. 74439, 74440 (Dec. 14, 2004).  The release noted that many money transmitters operating in the United States "operate through a system of agents both domestically and internationally" and to the extent that money transmitters use "foreign agents or counterparties to facilitate the movement of funds into or our of the United States, they must take reasonable steps to guard against the flow of illicit funds, or the flow of funds from legitimate sources to persons seeking to use those funds for illicit purposes."  Id. at 74440.  One such step is to determine "the foreign agent or counterparty's . . . licensing."  Id. at 74441.  Money transmitters must also ensure that their "foreign agents or counterparties are effectively implementing an anti-money laundering

program and . . . discern obvious breakdowns in the implementation of the program by the foreign agent or counterparty." Id.

Plaintiffs dismiss the interpretative release as inapplicable, having been promulgated long after the deal closed and constituting "the very first authority addressing operations with an unauthorized foreign correspondent as a . . . violation" of the applicable federal statute. (P. Mem. 23.) However, this is at best inaccurate; plaintiffs misunderstand the role of the interpretive release and ignore the import of the regulations that the release interprets, which require that Vigo have a program "reasonably designed" to prevent Vigo from being used to facilitate money laundering. 31 C.F.R. § 103.125(d). The interpretive release does not purport to establish new law, but to clarify what is already an "essential part" of a money transferor's "*existing obligation* . . . to develop and implement an effective anti-money laundering program." 69 F.R. at 74440 (emphasis added). Generally speaking, interpretive rules and releases are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," and "do not have the force and effect of law." Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979) (citation omitted). Although such a release may be persuasive, it is "not binding upon a court." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 222 (3d Cir. 2006), citing Dismas Charities, Inc. v. U.S. Dep't of Justice, 401 F.3d 666, 681 (6th Cir. 2005). What is binding on both this Court and Vigo is the regulation that is the subject of the release.[10]

---

[10] The interpretive release noted that the Department of Treasury would "expect full compliance with this Interpretive Release within 180 days." 69 F.R. 74441. Therefore, the release's "effective date" was June 13, 2005. Plaintiffs suggest that the release had no force before June 13. (P. Mem. 22.) Again, this argument is unconvincing. The release interprets the regulation as it exists and has existed since before the sale of Vigo closed, but provides for a three month delay in any enforcement proceedings so as to give individuals an opportunity to ensure their compliance with the regulations as interpreted by Treasury. As a general matter, an

That the agency charged with interpreting and enforcing Section 103.125 understood it to require money transmitters to take care that they deal with properly licensed correspondents only serves to confirm what a reasonable factfinder could conclude absent the release – that Vigo's compliance program, as it existed at the time of the sale, was neither "effective" nor "reasonably designed" to prevent Vigo from being used to facilitate money laundering because it operated exclusively through a correspondent operating on Brazil's black market.  31 C.F.R. § 103.125(a). Unsurprisingly, the black "market . . . has been linked to many types of money laundering and tax evasion schemes."  (Halper Decl. Ex. J, U.S. Money Transmitters in the Brazilian *Doleiro* Currency Market, at 4.)

The parties spend significant space and energy arguing about whether Politiburo's operations violated Brazilian law, but fail to provide the Court with much helpful guidance on the precise requirements of Brazilian law at the time of Vigo's sale to GMT.  However, regardless of whether operating without a license was illegal in Brazil, it is undisputed that Politiburo could have chosen to operate solely through Brazil's official market, as did Western Union (see P. Opp. 5 n.4), and a reasonable factfinder could conclude that operating solely through licensed operators in Brazil, even if somehow optional as a matter of Brazilian law, was the only way an American money services business could maintain an effective anti-money

agency is "free . . . to interpret its governing statute case by case through adjudicatory proceedings rather than by rulemaking" and "[i]n so doing, . . . may announc[e] and apply [ ] a new standard of conduct."  Stoller v. Commodity Futures Trading Comm'n, 834 F.2d 262, 265 (2d Cir. 1987) (citations and quotation marks omitted, second and third alteration in original). That Treasury voluntarily chose to delay its enforcement proceedings for a period of time (as opposed to making its interpretation known through a series of enforcement actions) does not mean that those whose anti-money laundering programs were deficient had not violated 31 C.F.R. § 103.125 in advance of June 13, 2005, but only that they received the benefits of Treasury's discretion not to prosecute any given case before a given time.

laundering program. On the basis of 31 C.F.R. § 103.125(a), plaintiffs' claim for summary judgment fails, and the Court need not determine at this stage of the proceedings whether Vigo or Politiburo in fact failed to comply with other U.S. or Brazilian laws.[11]

GMT has argued that Vigo's noncompliance stems from its relationship with Politiburo. Plaintiffs strenuously (and correctly) argue that "Vigo was specifically and expressly *not* warranting that correspondents [like Politiburo] (or agents) would be in compliance with applicable money transmitter laws." (P. Reply 6.) The contract warrants the compliance of "each Acquired Company and, to Vigo Stockholders' Knowledge, each of the Acquired Companies' respective Affiliates and Representatives (other than the Agents or the Correspondents)." (SCA § 3.14(a)(i).) Plaintiffs argue that finding that Vigo breached its warranty here, where the alleged breach is based on Vigo's relationship with a correspondent, would allow "[w]hat was explicitly carved out up front [to] be smuggled in through the back door," and insist that the "obvious and only conclusion from the language of the Stock Contribution Agreement has to be that Vigo cannot be held responsible for a breach of these warranty provisions on the basis of conduct by a correspondent." (P. Reply 6.)

It is simply not true, as plaintiffs suggest, that so reading the contract renders the carve-out meaningless. As the Court need not conclude that Politiburo violated Brazilian law to conclude that Vigo violated federal law by dealing with Politiburo, the carve-out is not directly at issue. There may be situations where what renders Politiburo noncompliant necessarily

---

[11] GMT argues in the alternative that at the time of its sale, Vigo was also noncompliant with New York State banking regulations. (See D. Opp. 9.) GMT fails to do anything but cite these regulations parenthetically, and fails to provide any analysis as to how Vigo could have violated those regulations.

renders Vigo noncompliant, but there may also be situations where Politiburo's noncompliance would not place Vigo in jeopardy of being used to facilitate money laundering or of being otherwise noncompliant. In such an event, the carve-out would prevent GMT from validly asserting any breach of contract. However, the carve-out does not operate to insulate plaintiffs from otherwise applicable contractual provisions. Here, a reasonable factfinder could conclude that Vigo's relationship with Politiburo violated federal law not because Politiburo violated Brazilian law, but because Vigo (via its use of Politiburo) operated through Brazil's black market. On that basis, a reasonable factfinder could conclude that plaintiffs breached their warranty to GMT that "[Vigo] . . . is, and at all times since June 30, 1995 has been, in full compliance" with various money transfer laws. (SCA § 3.14(a)(i).)[12]

## 2. Material Breach

Plaintiffs next argue that any alleged broken warranty did not result in any material adverse effect to GMT. (P. Mem. 32.) Plaintiff's argument can be rejected out of hand. To determine whether a broken warranty amounts to a material breach, courts must consider several factors, including the "absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and [the] degree to which injured party has benefitted under contract." Merrill Lynch, 500 F.3d at 186, citing Hadden v. Consol. Edison Co. of N.Y., 34 N.Y.2d 88, 96 (1974). "The issue of whether a party has substantially performed is usually a question of fact

---

[12] Contrary to plaintiffs' argument (P. Mem. 31-32), whether plaintiffs knew that Vigo was compliant or not is irrelevant to whether plaintiffs breached this contractual warranty. In the applicable section of the contract, plaintiffs' knowledge is an element of the warranties relevant only to the compliance of Vigo's "Affiliates and Representatives," but not to the warranty relating to the compliance of Vigo itself. (See SCA § 3.14(a)(i).)

and should be decided as a matter of law only where the inferences are certain." <u>Merrill Lynch</u>, 500 F.3d at 187.

As an initial matter, it is not clear that the broken warranty must have been material to constitute a breach. Although noncompliance with other warranty provisions constitutes a breach only to the extent the noncompliance "could reasonably be expected to have a Material Adverse Effect," plaintiffs warranted the full compliance of "each Money Transfer Law and each Legal Requirement" without any such qualification (SCA § 3.14(a)(i); <u>see also</u> <u>id</u>. at § 3.14(a)(ii)), suggesting that the parties agreed by contract that any broken warranty regarding Vigo's compliance with laws and regulations concerning its central business would be per se material. In any event, a reasonable factfinder could conclude that Vigo's failure to comply with applicable domestic anti-money laundering provisions could reasonably be expected to have a material adverse effect on Vigo's liabilities. Since Vigo's core business is international money transfers, a reasonable factfinder could conclude that compliance issues involving transfers to Brazil, Vigo's largest market, would prove deeply problematic for GMT, and that purchasing a fully compliant business, or a business warranted to be fully compliant, was a fundamental precondition of GMT's purchase of Vigo. Plaintiffs argue that "the events that might have, even conceivably, prompted plaintiffs to worry about their correspondent in Brazil did not take place until after the closing." (P. Mem. 32.) However, whether plaintiffs and GMT were blissfully ignorant of Vigo's exposure at the time of its sale is irrelevant, and that subsequent events may have further exposed Vigo to liability (or made clearer the extent of Vigo's legal exposure) does not negate the possibility that a reasonable factfinder could conclude that the breach was material at the time of the warranty.

3.      Waiver

Plaintiffs argue that GMT also waived any right to rely on the contractual warranty

provisions at issue.  Specifically, plaintiffs claim that they informed GMT in advance of closing

that Vigo operated exclusively through an unlicensed correspondent in Brazil.  (P. Mem. 33.)

However, a reasonable factfinder could conclude otherwise.

GMT makes some effort to contest plaintiffs' claim that GMT knew in advance of

closing that Politiburo was unlicensed (see D. Rule 56.1 Stmt. ¶ 51), but that position is dubious

at best (see, e.g., Zubatov Decl. Ex. L, Deposition of Mario Trujillo, dated Oct. 10, 2007,

("Trujillo Dep.") 66; id. Ex. R at 5).  That a sophisticated enterprise run by skilled

businesspeople and accountants would spend $75 million for a money transmission business

without understanding the very fundamentals of the exchange rate calculations that determine

how the business generates revenue in its largest market is hardly credible.  However, the critical

issue is not whether GMT knew of, but whether plaintiffs disclosed to GMT, facts that would

constitute a breach of the warranties at issue here.  If GMT closed on the contract "in the full

knowledge and acceptance of facts disclosed by [plaintiffs] which would constitute a breach of

warranty under the terms of the contract," it would have waived its right to rely on the

contractual warranty provisions unless it "expressly preserve[d] [its] rights under the

warranties."  Galli v. Metz, 973 F.2d 145, 151 (2d Cir. 1992).[13]

_____

[13] Trujillo testified that he "probably" first found out about Politiburo's status from Roger
Timm, a colleague of his.  (Trujillo Dep. at 212-214.)  However, the dispositive issue is not from
whom Trujillo (or any other member of GMT) first found out about Politiburo's status, but
whether plaintiffs disclosed Politiburo's status to GMT in advance of closing.

Plaintiffs argue that Roger Timm, a member of GMT's management team who conducted due diligence on the "international side" of Vigo's operations, admitted that prior to closing plaintiffs disclosed to him Politiburo's lack of licensure. The record, however, is not so clear. Timm testified that Gusmao told him "before closing of the transaction" that Politiburo was operating in the black market, but went on to testify that he was "not sure how we found out that [Politiburo was] operating in the parallel market. It could have been from [Gusmao], could have been from someone else . . . [within] Vigo." (Timm Dep. at 37-38.) Timm's testimony can be read in at least two ways: either that he was not sure who within Vigo informed him of Politiburo's status, or that he was not sure whether anyone from Vigo ever told him about Vigo's status. As both readings are reasonable, on summary judgment the Court must adopt the interpretation that favors GMT as the nonmoving party – that no GMT employee admitted that plaintiffs or anyone else from Vigo informed GMT of Politiburo's status in advance of closing.

Plaintiffs also insist that, by email dated December 17, 2002, the day before the SCA was signed, Gusmao specifically told Trujillo that Vigo operated through Brazil's black market. (Zubatov Decl. Ex. T.) Again, the facts are not so clear. Mario Trujillo, an officer of GMT, wrote to Gusmao to ask: "[d]o you realize that we have lost about 33% of our Volume to Brazil . . . in just the last few months? How can we stop the bleeding? Western Union is much cheaper than we are in Brazil." (Id.) In response, Gusmao notes that the:

> lost volume to Brazil has to do with the exchange rate were only
> for the second time as far as I can remember the official has been
> higher than the black market . . . our losses has be a gain only by
> W.Union, as you probably knows we (Vigo) and other money
> transmitter have lost agents to them, but as soon as the situation
> changes those agents will return to us.

(Id.)  A reasonable factfinder could conclude that Gusmao's somewhat opaque response explains that Vigo's lost business was due to Western Union operating on the official exchange rate and Vigo operating on the black market, because at that particular time one dollar could be exchanged for more reais on the official market than on the black market, and therefore Western Union was operating with a competitive advantage.  Such a factfinder could conclude that Gusmao disclosed to Trujillo (either in the email, or beforehand) that Vigo operated through Brazil's black market.  However, a reasonable factfinder could read the communication differently or could conclude that Trujillo simply did not understand Gusmao's letter.  Upon receipt of Gusmao's email, Trujillo forwarded it to other members of GMT, stating "I am not sure [Gusmao] gets it."  (Id.)  Since a reasonable factfinder could conclude otherwise, the Court cannot conclusively hold that Gusmao (or any other plaintiff) disclosed to Trujillo (or anyone else at GMT) that Vigo operated exclusively through an entity solely operating on the black market.  Therefore, the Court cannot conclude on summary judgment that GMT waived its contractual right to hold plaintiffs to their warranties.

     4.    <u>Damages</u>

Plaintiffs next attack GMT's alleged damages.  The party injured by a breach of contract may seek "two distinct categories of damages," general or market damages, and special or consequential damages.  <u>Schonfeld v. Hilliard</u>, 218 F.3d 164, 175 (2d Cir. 2000) (citation omitted).  General damages compensate the injured party for the "value of the very performance promised."  <u>Schonfeld</u>, 218 F.3d at 175 (citation and internal quotation marks omitted).  Under New York law, "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms."  <u>Merrill Lynch</u>, 500

F.3d at 185, citing <u>Boyce v. Soundview Tech. Group, Inc.</u>, 464 F.3d 376, 384 (2d Cir. 2006); <u>see</u> <u>also</u> <u>Menzel v. List</u>, 298 N.Y.S.2d 979, 983 (1969); <u>Wechsler v. Hunt Health Sys., Ltd.</u>, 330 F. Supp. 2d 383, 424-25 (S.D.N.Y. 2004). Where the breached contract involved a business relationship between two parties, such as a supply contract, a party's "recovery may include the profits which he would have derived from performance of the contract." <u>Rogen v. Scheer</u>, No. 86 Civ. 2058, 1991 WL 33294, at *7 (S.D.N.Y. Feb. 22, 1991) (citation and internal quotation marks omitted). Where a party purchased a company on the basis of inaccurate warranties, the injured party is normally "entitled to the benefit of its bargain, measured as the difference between the value of [company] as warranted by [sellers] and its true value at the time of the transaction." <u>Merrill Lynch</u>, 500 F.3d at 185; <u>see</u> <u>also</u> <u>Schonfeld</u>, 218 F.3d at 175-76 (measuring damages "by the difference between the contract price and the market value of the goods at the time of the breach" (citation and internal quotation marks omitted)). General damages include those damages that are that are "the natural and probable consequence of the breach." <u>Kenford</u> <u>Co. v. County of Erie</u>, 73 N.Y.2d 312, 319 (1989).

      An injured party is also entitled to consequential damages in compensation "for additional losses (other than the value of the promised performance) that are incurred as a result of the . . . breach," <u>Schonfeld</u>, 218 F.3d at 175 (citation omitted), and that "were within the contemplation of the parties when the contract was made," <u>id</u>. at 172 (citation omitted); <u>accord</u> <u>Kenford</u>, 73 N.Y.2d at 319; <u>GSI Group, Inc. v. Zim Integrated Shipping Servs., Ltd.</u>, No. 06 Civ. 1707, 2008 WL 2403431, at *4 (S.D.N.Y. June 9, 2008). A party may also seek "hybrid" damages, a species of consequential damages, for recovery of a lost income-producing asset, such as certain contractual rights, and in those instances "the most accurate and immediate

measure of damages is the market value of the asset at the time of breach – not the lost profits that the asset could have produced in the future." Schonfeld, 218 F.3d at 175 (citation omitted).

Plaintiffs audaciously argue GMT has no claim for damages because any damages were "expunged" by the sale of GMT and Vigo to First Data Corp. ("First Data") in October 2005. (P. Mem. 37.) Plaintiffs offer no support for the remarkable position, and only assert that since First Data purchased GMT and Vigo after conducting "extensive due diligence," First Data "knew of the Brazil situation and paid a price for the company that took account of the then-current state of the income stream from the Brazil market." Id. This argument fails at numerous levels. There is no reason why the sale of a corporate entity would somehow alter that entity's pre-existing rights, and even had Vigo and GMT changed corporate form after being harmed by plaintiffs, the result would be no different. It is well-established in New York that, as a general rule, "nothing is lost by a merger . . . the company formed by the merger stands in the place of those merged, and any right which belonged to them can be asserted by it." W.H. McElwain v. Primavera, 167 N.Y.S. 815, 816 (1st Dep't 1917); see also N.Y. Bus. Corp. Law § 906(b); Lomas & Nettleton Co. v. Cent. Fed. S&L Assn., No. 80 Civ. 975, 1981 U.S. Dist. LEXIS 13429, at *12 (S.D.N.Y. July 9, 1981). A contrary result would allow an entity's sale or change in corporate form to absolve a wrongdoer of its liabilities.

In any event, plaintiffs are wrong to suggest that the purchase price for GMT did not incorporate the value of GMT's claim against plaintiffs. In addition to its future revenue stream, an entity's contingent claims, like its contingent liabilities, would effect its sale price. An entity with a ten percent chance of winning ten million dollars would be worth approximately one million dollars more to a risk-neutral purchaser than it would be without that contingent claim.

It would be unfair to First Data, who purchased GMT and Vigo based on their total portfolio of assets and liabilities, and presumably paid more for GMT because GMT had contingent claims outstanding against plaintiffs for plaintiffs' alleged breach, to neutralize these claims absent their adjudication.[14]

In a further effort to limit GMT's claims of damages, plaintiffs contend that "the decision to terminate Politiburo was made by defendants prior to the closing for multiple reasons having nothing to do with legal or 'licensing' issues." (P. Mem. 35.) However, this argument fails to carry plaintiffs to summary judgment. Even assuming that GMT had the eventual goal of replacing Politiburo as a correspondent (as opposed to merely adding additional correspondents), and even though plaintiffs provide numerous reasons why GMT may have wanted (at some point) to terminate their relationship with Politiburo, a reasonable factfinder could conclude that Vigo (and GMT) terminated Vigo's relationship with Politiburo so as to comply with federal law, and that but for Politiburo's unlicensed status, Vigo would not have terminated the relationship when it did. Vigo's letter stated that it was terminating its relationship with Politiburo for compliance reasons (Halper Decl. Ex. G), and a reasonable factfinder could conclude as much.[15]

_____

[14] GMT claims that it is no longer owned by First Data (D. Rule 56.1 Stmt. ¶ 2), but for the reasons already discussed, GMT's recovery depends not on who owns it, but on whether it has a cognizable claim against plaintiffs.

[15] Plaintiffs also suggest that even assuming GMT terminated Politiburo for compliance reasons, GMT was not obliged to do so, and did so only out of a desire to go beyond what was legally required in order to become a "poster child for compliance in the industry." (P. Mem. 35-36.) Therefore, plaintiffs contend, "any damages were caused by defendants' own voluntary choice to move ahead of nearly all of their competitors in ending their reliance on the Brazilian parallel market." (Id. at 36.) As there is a genuine issue of fact regarding whether Vigo's relationship with Politiburo rendered Vigo noncompliant with federal laws, this argument must

Plaintiffs argue that GMT was not "damaged" by plaintiffs' breach of warranty because GMT had no "price protection from Politiburo." (P. Mem. 36.) GMT insists that they did have price protection from Politiburo, by virtue of a formal contract. (D. Opp. 21; see Zubatov Decl. Ex. P.) The contract set forth a specific fee schedule that could be amended "as agreed by the Parties," (Zubatov Decl. Ex. P § 3(b)), not by the unilateral declaration of any particular party. Therefore, a reasonable factfinder could conclude that GMT had some reasonable expectation in the stability of Politiburo's rate schedule with Vigo for at least some period of time following Vigo's termination of Politiburo. On that basis, it is at least plausible that GMT suffered damages for the loss of Politiburo's services.

Plaintiffs also argue that GMT cannot properly claim damages after April 30, 2004, which is when Politiburo notified Vigo, by letter dated February 27, 2004, that it would cease to serve as Vigo's Brazil correspondent. (P. Mem. 37-38; Zubatov Decl. Ex Z.) GMT disputes that its damages are somehow limited, and points to the provision of the SCA requiring plaintiffs to indemnify GMT for "any loss," including incidental and consequential damages, stemming from a breach of warranty. (D. Opp. 23.)

Plaintiffs' argument cannot carry them to summary judgment for at least two reasons. First, a reasonable factfinder could conclude that Politiburo's letter operated not to terminate the contract as of April 30, 2004, but to launch the opening salvo in an effort by Ivan Freire, Sr.,

---

be rejected. A reasonable factfinder could conclude, especially given Western Union's avoidance of black market operations, that American money transfer companies were required to operate in the official market. In any event, in an industry where compliance is the exception rather than the rule, being the "poster child" may mean not that one is ahead of the regulations, but that one is the sole compliant company, and perhaps the only company to avoid a global industry settlement.

("Freire") to renegotiate the contract on terms more favorable to Politiburo, and thereby extract as much as possible from the new owners of Vigo. Freire, Politiburo's principal, was a former fifty percent owner of Vigo, along with Gusmao. (Gusmao Dep. at 14-16, 19.) Before Vigo's ultimate sale to GMT, Freire transferred his interest in Vigo to his two sons, Flavio and Ivan, Jr. (Id. at 16-17.) A reasonable factfinder could identify a pattern by Politiburo through Freire of attempting to exploit Vigo's dependency upon it after Vigo's sale to GMT, and conclude that Politiburo's letter was part of that pattern. For example, forty-eight hours after the deal closed, Freire informed GMT that Politiburo was tripling its rates. (See Zubatov Decl. Ex. S.) As even plaintiffs note, "defendants were at the mercy of Mr. Freire – their sole correspondent in Brazil, without whom they could not conduct business there until they found a suitable replacement." (P. Mem. 37.) Of course, a reasonable factfinder could conclude that Freire misjudged the situation, and what he may have intended as an invitation to bargain was flatly rejected by GMT. After all, Politiburo did not send the letter purporting to terminate its relationship with Vigo until February 27, 2004, (Zubatov Decl. Ex. Z), and according to the parties' contract, if Politiburo failed to notify Vigo "in writing, not less than 60 days before [March 12, 2003,] of its intention to cancel the agreement," then the agreement would "automatically renew[] for an additional one year-term commencing on the anniversary date of [March 12, 2003,]" (Zubatov Decl. Ex. P § 8(a)). GMT could have insisted that Politiburo was obligated by contract to continue as GMT's correspondent, as it did when Politiburo attempted to triple its rates (see Zubatov Decl. Ex. S), but it did not. Instead, it sent its own letter of termination. (Halper Decl. Ex. G.) In this scenario, a reasonable factfinder could conclude that Vigo, not Politiburo, effectively terminated the contract.

Second, even assuming that Politiburo's letter terminated the contract effective April 30, 2004, a reasonable factfinder could conclude that Politiburo's actions were not independent of, but precisely dependent upon, Vigo's plan to terminate the relationship. Perhaps Politiburo's principal, with his strong ties to plaintiffs and their outstanding interest in the funds in escrow, could see the writing on the wall; Vigo had requested as early as October 2003 that Politiburo verify its compliance with Brazilian laws (see Halper Decl. Ex. G) and in early 2004 Vigo was formalizing its relationship with Bradesco, a properly licensed correspondent. Vigo's termination of its relationship with Politiburo on the basis of Politiburo's unlicensed operations (which would be easier for Vigo to do after lining up a replacement like Bradesco) would likely decrease plaintiffs' chances of recovering the funds in escrow. A reasonable factfinder could conclude that Politiburo preemptively terminated the relationship in an effort to insulate plaintiffs from various claims by GMT for damages, and therefore that Politiburo's termination was effectively caused by and dependent upon Vigo's imminent termination of the relationship.[16] On this basis, plaintiffs' arguments cannot not entitle them to summary judgment limiting GMT's damages beyond April 30, 2004.[17]

---

[16] Alternatively, a reasonable factfinder could conclude that Vigo ultimately terminated the contract because it knew that Politiburo intended to discontinue operations with Vigo, and Vigo's preemptive breach was an opportunistic gambit designed to terminate what Vigo knew to be a doomed relationship in the hopes of extracting funds from plaintiffs, and perhaps from Politiburo. However, this is at heart a factual dispute that cannot be resolved on summary judgment.

[17] Even assuming for the moment that Politiburo's letter independently and definitively terminated the contract effective April 30, 2004, it is simply not clear that plaintiffs' proposed rule, which would limit damages at the summary judgment stage based upon an anticipated superseding event, is appropriate under the circumstances. Such a rule could effectively reward actual wrongdoers with windfalls (by insulating them from otherwise applicable claims of damages) on the basis of hypothetical or future happenings.

The rejection of plaintiffs' various efforts to limit GMT's claims of damages is not necessarily an endorsement of GMT's theory of damages. Plaintiffs have failed to raise certain issues that the Court may need to eventually and definitively address; for the time being, three issues merit brief comment. First, GMT insists that it is entitled to "the profits that GMT would have otherwise earned on its Brazilian transaction volume had Politiburo been properly licensed" (D. Opp. 11), and GMT's damages expert bases his calculations on Vigo's historical performance, projecting that GMT through Vigo would earn "the same revenue on its Brazilian money transfer transactions as [Vigo's] actual 2003 to 2005 revenue per transaction," (Zaumeyer Rep. ¶ 6(b).) However, during that time period, Vigo's Brazilian transactions were made exclusively through the black market, and GMT has no legitimate expectation interest in, and therefore no proper claim of damages for, Vigo's lost profits based on continued illegal operations.

Second, GMT may have a claim for the loss of services of Politiburo, but either before or roughly simultaneously with Vigo's termination of Politiburo, Vigo began to operate through a fully licensed Brazilian correspondent, Bradesco. At this stage, it is less than clear what consequential damages might stem from Vigo's switch from an unlicensed correspondent to exclusively licensed correspondents, what damages stem from Vigo's inability to find an adequate substitute for a properly licensed Politiburo, and what damages are properly considered to be "within the contemplation of the parties when the contract was made." Schonfeld, 218 F.3d at 172.[18] Just as GMT does not appear to be entitled to damages in the form of lost profits

---

[18] It is also not immediately clear whether Vigo's claim regarding Politiburo is more appropriately characterized as one stemming from the "lost operating profits of a business," from "the loss of an income-producing asset" in the form of Vigo's contract with Politiburo, or from

based on future black market operations, so too it does not appear to be entitled to damages stemming from the basic costs of doing business in the official market, through Politiburo or any other correspondent.

Third, GMT also seeks damages because "GMT discontinued the services of Politiburo for dollar payments in Brazil." (Zaumeyer Rep. ¶ 5.) However, Vigo's compliance officer testified that "dollar payments of remittances in Brazil . . . were prohibited by the Central Bank of Brazil." (Guerrero Dep. at 32.) Assuming Vigo would never have made dollar payments to Brazil in the first place had it properly complied with Brazil's Central Bank, then GMT would likewise appear to have no legitimate expectation interest in lost profits from continued dollar payments in violation of Brazilian law. In sum, as plaintiffs warranted the full compliance of Vigo, GMT has no reasonable expectation interest in profits based on Vigo's continued noncompliance.

In a breach of contract case such as this involving the sale of a corporate entity on the basis of allegedly false warranties, the injured party is normally entitled to "the difference between the value of [the entity] as warranted by [sellers] and its true value at the time of the transaction." Merrill Lynch, 500 F.3d at 184. Conceptualized as such, the "dispositive question [regarding the proper measure of damages] is whether [GMT] would have insisted on a lower price had it not believed it was purchasing plaintiff[s'] promise to compensate it for any injury caused by the falsity of the warranted facts." Id. at 186. GMT may have based its purchase offer on plaintiffs' warranties and its expectation of future profits projected from Vigo's historical financials, including its historical costs of doing business with an allegedly fully compliant

---

something else. See Schonfeld, 218 F.3d at 176.

correspondent, and its expectation of continued dollar remittances to Brazil. The present value, at the time of the sale, of these lost (but potentially illegal) profits may be an appropriate proxy for the amount GMT overpaid for Vigo. If this is so, then perhaps the potential problems with GMT's damages claims are ones of form and not substance. At any rate, at least at this point, without the benefit of any submissions by the parties on this issue, GMT's proper measure of damages appears to be based on overpayment, not on an entitlement to future illegal profits. The Court expresses no opinion about whether any of these issues have been properly raised (or waived), and these comments are meant not to resolve but to raise issues that may become relevant going forward. None of these issues change this Court's holding: that plaintiffs' claims for summary judgment dismissing GMT's breach of contract claim or limiting GMT's damages flowing therefrom must be denied.

B.    Negligent Misrepresentation

Although GMT's breach of warranty claim survives, its negligent misrepresentation claim must fail. As an initial matter, GMT fails to properly plead the tort of misrepresentation by failing to allege that plaintiffs owed GMT a special duty. (See Am. Countercl. ¶ 13.) GMT merely alleges that plaintiffs represented to GMT that Vigo was in full compliance, even though Vigo was not in full compliance, and that GMT relied on that representation to its detriment. (Id.) The only duty that GMT appears to allege is plaintiffs' duty to comply with the terms of the contract, and "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, 521 N.Y.S.2d at 656. Since GMT fails to even allege that plaintiffs owed GMT some duty independent of its contractual duties, its allegations are deficient as a matter of law.

Even could GMT's counterclaim survive a motion to dismiss (which it cannot), GMT fails to proffer any evidence from which a reasonable factfinder could conclude that plaintiffs had (and breached) a special duty to GMT. Plaintiffs of course had detailed knowledge about the structure of Vigo, but "this amounts to nothing more than knowledge of the particulars of the company's business – and of the true situation underlying the misrepresentations pertaining to that business," and "does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context." JP Morgan, 350 F. Supp. 2d at 402. "Any other ruling would allow plaintiffs to claim a tort in every breach of contract case." Robehr, 1989 WL 111079, at *4. GMT also argues that the various current and former ownership interests in both Politiburo and Vigo by different members of the Freire family creates a "dual relationship" that raises factual issues about whether plaintiffs had some special relationship or special duty to GMT. (D. Opp. 25.) However, there is no evidence in the record from which a reasonable factfinder could conclude that plaintiffs made any representations beyond those contained in the contract. The contract specifically declined to warrant the "full compliance" of Politiburo, and therefore the only potential misrepresentation at issue is one by the *owners* of Vigo *as to Vigo.* The Court has already held that plaintiffs' detailed knowledge of Vigo – an entity within the direct scope of plaintiffs' representations – was insufficient to trigger a special duty; *a fortiori* plaintiffs' knowledge of Politiburo – an entity outside the scope of any direct and explicit warranty – was equally insufficient to trigger a special duty.

GMT "disputes [plaintiffs'] assertion[]" that GMT has not identified the special non-contractual duty that plaintiffs owed GMT, but never identifies the particular duty which it claims plaintiffs breached. (See, e.g., D. Rule 56.1 Stmt. ¶ 173.) Moreover, GMT fails to

provide any specific evidence in their Rule 56.1 Statement from which a reasonable factfinder could conclude that a special duty existed or was breached. (See, e.g., id.) Such "unsupported denials, without more, cannot create disputes of material fact" to prevent an otherwise proper motion for summary judgment. AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Servs. Inc., No. 06 Civ. 2142, 2007 WL 4302514, at \*4 (S.D.N.Y. Dec. 7, 2007); see Fed. R. Civ. P. 56(e). Since GMT proffers no specific facts demonstrating a genuine issue for trial beyond the issue central to this case – whether plaintiffs breached their contractual warranties to GMT, and whether GMT was thereby damaged – GMT's tort claim must be dismissed.

## CONCLUSION

Accordingly, plaintiffs' motion for summary judgment dismissing GMT's breach of warranty claim is denied, and their motion for summary judgment dismissing GMT's claim of negligent misrepresentation is granted.

SO ORDERED.

Dated: New York, New York
August 1, 2008

GERARD E. LYNCH
United States District Judge

33