UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                       :

HELIO GUSMAO, et al.,              :

           Plaintiffs,          :

                                         :        06 Civ. 5113 (GEL)

    -against-                :

                                       :        **OPINION AND ORDER**

GMT GROUP, INC., et al.,      :

                                       :        **FINDINGS OF FACT AND**
                                       :        **CONCLUSIONS OF LAW**

                    Defendants.       :

                                       :

---------------------------------------------------------------x

Richard J.J. Scarola, Paul S. Ellis, and Alexander
Zubatov, Scarola Ellis LLP, for plaintiffs.

Karim Kaspar and Jason Halper, Lowenstein
Sandler PC, for defendants.

GERARD E. LYNCH, District Judge:

       This dispute arises from an alleged breach of a contract for the sale of Vigo Remittance

Corporation, an international money transfer service provider.  Plaintiffs Helio Gusmao, Flavio

Newlands Moniz Freire, and Ivan Newlands Moniz Freire brought suit against defendants GMT

Group, Inc., and Global Money Transfers, Inc., to procure the full release of certain funds held in

escrow and blocked by defendants purportedly on account of plaintiffs' breach of various terms

of the sale agreement.  Defendants counterclaimed, seeking a declaratory judgment that, based

on plaintiffs' breach of certain contractual warranties and their negligent misrepresentation that

Vigo's correspondent was properly licensed to conduct money transfer transactions in Brazil,

defendants are entitled to at least $1.1 million of the amount held in escrow.  The case was tried

before the Court without a jury on February 2 and 3, 2009.  This Opinion sets forth the Court's

Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil

Procedure.  To the extent any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice versa.  For the reasons discussed below, the Court concludes that defendants have failed to prove any breach of warranty by plaintiffs.  Judgment will therefore be entered for plaintiffs.

**FINDINGS OF FACT**

I.    **Background**

    A.    <u>The Parties</u>

1.  Plaintiffs Helio Gusmao, Flavio Newlands Moniz Freire, and Ivan Newlands Moniz Freire are the former owners of Vigo Remittance Corporation, a New York corporation, and Vigo Remittance Corporation, an Ontario, Canada, corporation (collectively, "Vigo"), both of which are engaged in the international money transfer business.  (Gusmao Decl. ¶ 1; Am. Compl. at ¶ 9; Am. Answer at ¶ 9.)

2.  Defendants GMT Group, Inc. and Global Money Transfers, Inc. (collectively, "GMT") are Delaware corporations with their principal places of business in Colorado.  (Am. Compl. at ¶¶ 5-6; Am. Answer at ¶¶ 5-6.)

    B.    <u>Nature of the Dispute and Procedural History</u>

3.  In 2003, plaintiffs sold their interest in Vigo to GMT for $76.5 million and certain stock in GMT.  (Am. Compl. at ¶¶ 10-11; Am. Answer at ¶¶ 10-11.)  Pursuant to the contract, GMT held approximately $5 million of the purchase price in escrow against plaintiffs' promise to indemnify it for any breaches of various contractual warranties.  (Am. Compl. at ¶¶ 16-17; Am. Answer at ¶¶ 16-17.)

4.  After the sale was consummated, GMT claimed indemnification rights against the escrow and refused to release any of the funds to plaintiffs.  In particular, it asserted five separate

claims for indemnification totaling more than $15.5 million.  (JE39.)  Defendants have since abandoned or resolved four of those claims, and released approximately $3 million of the funds held in escrow.  (Tr. 43.)

5.  Plaintiffs commenced this action on July 5, 2006, asserting that GMT lacks any basis for withholding the funds and is therefore in violation of the terms of the sale agreement. (Compl. ¶¶ 46-47, 56; see also Am. Compl. ¶¶ 45-46, 57.)  GMT subsequently counterclaimed, asserting that it is entitled to at least $1.1 million of the amount held in escrow because plaintiffs breached certain contractual warranties and negligently misrepresented that Vigo's Brazilian operation was in compliance with all applicable laws.  (Countercl. ¶¶ 10-13, 17, 20; see also Am. Countercl. ¶ 3, 9, 13, 15-16.)

6.  In an August 1, 2008, Opinion and Order, this Court denied plaintiffs' motion for summary judgment in part, finding genuine issues of material fact relating to the alleged breach of contractual warranties.  See Gusmao v. GMT Group, Inc., No. 06 Civ. 5113, 2008 WL 2980039, at *13-14 (S.D.N.Y. Aug. 1, 2008) [hereinafter, "Gusmao I"].  The Court did, however, grant plaintiffs' motion for summary judgment on the negligent misrepresentation claim, as GMT had not sufficiently alleged that plaintiffs owed it any legal duty independent of the contract itself, nor had it submitted any evidence from which a reasonable factfinder could conclude that plaintiffs possessed the kind of specialized knowledge required to impose a duty of care in a commercial context.  See id. at *15-16.

7.  In light of Gusmao I, the only remaining claim in this matter involves GMT's allegation that it has suffered damages because Vigo's Brazilian correspondent – the entity that effectuated the payment of funds to the intended beneficiaries in Brazil – was improperly licensed under Brazilian law, so that GMT was forced to terminate that correspondent

3

relationship in order to comply with certain provisions of U.S. law.

C.        The Parties' Contentions

8.  GMT argues that at the time of its sale, Vigo was in violation of the Bank Secrecy Act of 1970, Pub. L. 91-508, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (the "PATRIOT Act"), Pub. L. 107-56, and its implementing regulations, which required Vigo to maintain a compliance program that was "effective" and "reasonably designed" to prevent the company from being used to facilitate money laundering.  (GMT Post-Tr. Mem. 1-2.)  In support of this argument, GMT cites what it claims are numerous failings on the part of Vigo and its Brazilian correspondent.  These include: Vigo's use of exchange houses operating in Brazil's parallel market, rather than banks authorized by the Central Bank of Brazil to make remittance payments; Vigo's failure to determine whether its correspondent was properly licensed to effect money transfers or had an anti-money laundering compliance program; the correspondent's payment of funds in U.S. dollars (rather than Brazilian reais) and to persons with expired CPF numbers;[1] and Vigo's failure to terminate the correspondent or otherwise change course when apprised of criminal charges pending against the correspondent's owner.  (Id. 5-8.)

9.  In response, plaintiffs argue that the warranty provisions cited by GMT do not apply to the conduct at issue in this case, and even if they did, that GMT has failed to prove that Vigo's operations violated any provision of U.S. law, or that its correspondent's operations violated any provision of Brazilian law.  (P. Post-Tr. Mem. 2-14, 21-22.)  Plaintiffs also contend that GMT is not entitled to rely on the relevant warranty provisions because – prior to the closing of the sale –

_____

[1] CPF (Cadastro de Pessoas Fisicas) numbers are the Brazilian equivalent of social security numbers in the U.S.  (See, e.g., Tr. 128.)

plaintiffs disclosed to GMT the very facts that GMT now contends constitute a breach of warranty (id. 14-17), and any damages GMT incurred as a result of its termination of Vigo's Brazilian correspondent, or of dollar payments, are attributable not to a breach of warranty, but instead to GMT's independent decision to replace the correspondent with its own network of payors and to discontinue dollar payments.  (Id. 17-19, 21-22.)  Finally, plaintiffs challenge the adequacy of GMT's notice of claim and the validity of its damages theory and analysis.  (Id. 19-26.)

## II.    The Creation and Ownership of Vigo

10.  Vigo was co-founded in 1985 by Helio Gusmao, a named plaintiff in this action, and Sergio Vilhena, a Brazilian citizen.  (Gusmao Decl. ¶ 7.)  The company was established as an international money transfer service provider, and its initial geographic reach was limited to Brazil.  (Gusmao Decl. ¶ 10; Tr. 46-47.)  By the time of the events giving rise to this dispute, however, Vigo customers could send money to forty-seven nations throughout Africa, Australia, Europe, and Latin America.  (Gusmao Decl. ¶ 11; cf. Tr. 46-47.)

11.  Vigo opened its first office in Newark, New Jersey, but because of the company's rapid success, Gusmao and Vilhena soon decided to obtain a money transfer license from the State of New York and move the company's headquarters to Manhattan.  (Gusmao Decl. ¶¶ 7-8.)

12.  Because securing a money transfer license required approximately $500,000, Gusmao and Vilhena agreed to raise the money by bringing a new partner into the business. (Gusmao Decl. ¶ 15; Tr. 48-49.)  The two ultimately decided on Ivan Freire ("Freire"), a resident of Brazil whom Gusmao had met in the early-to-mid 1980s while operating as an exporter of goods to that country.  (Gusmao Decl. ¶ 16; Tr. 49.)

13.  In or about 1991, Vilhena left Vigo and began another money transfer company in

Miami called Uno. (Gusmao Decl. ¶ 17; Tr. 50.) Following his departure, Gusmao and Freire redistributed the outstanding shares such that each of them possessed a 50% interest in Vigo. (Tr. 50.)

14. In the mid-1990s, Freire transferred his 50% interest in Vigo to his sons, named plaintiffs Flavio Newlands Moniz Freire and Ivan Newlands Moniz Freire (collectively, the "Freire Brothers"). (Gusmao Decl. ¶ 27; Tr. 51.) Gusmao, however, retained the remaining 50% interest in Vigo, as well as decision-making authority for the company. (Tr. 52.)

## II.     Vigo's Brazilian Operations

15. An international money transfer service provider like Vigo collects money from a sender in the United States and remits payments designated by that sender to the appropriate beneficiary in the destination country. (Gusmao Dep. 11, 38-42.)  To process such transactions, a money transfer service provider requires a correspondent in the destination country.  The correspondent – also referred to as the payor – is the entity on the receiving end of the money transfers which, given the recipient's bank information, account name and branch number, directs those transfers into the recipient's bank account. (Gusmao Dep. 38, 42-43; see also Tr. 113.)

16. Consistent with this general description, in order to utilize Vigo's services to effect a money transfer to Brazil, a customer would visit one of the company's branches in the United States and identify the intended recipient of the funds transfer, including the recipient's name and his or her banking information and CPF. (Tr. 93-95; Trujillo Dep. 51-52.)  Vigo would relay that information to its Brazilian correspondent, which would effect the transfer into the paying bank. (Tr. 93-95; Trujillo Dep. 51-54.)  The customer paid an up-front fee for this service (Trujillo Dep. 52), and the recipient generally received Brazilian reais in accordance with the

"retail" exchange rate for dollars.  (Cf. Tr. 97.)  Ultimately, Vigo profited from the up-front fee

paid by the customer, and by capturing the "FX [foreign exchange] spread," which is the

difference between the retail and wholesale exchange rates.  (Gusmao Decl. ¶ 18; cf. Tr. 53.)

17.   During the early stages of its operations, Vigo did not have an exclusive

correspondent in Brazil.  (Gusmao Decl. ¶ 19.)  Instead, it worked with a variety of exchange

houses, negotiating exchange rates, prices and quality of service on an ad hoc basis.  (Id.; Tr. 49-

50.)  Eventually, Vigo selected Politiburo Cambio e Turismo, Ltda. ("Politiburo") as its

exclusive Brazilian correspondent.[2]  (Gusmao Decl. ¶ 19; Tr. 47-48.)

18.   Owned and operated by Freire,[3] Politiburo was an "exchange house," or a business

that buys and sells currency.  (Gusmao Decl. ¶ 20; cf. Gusmao Decl. ¶¶ 18-19, 21; Tr. 47-48, 50;

JE42 at 15.)  Like many exchange houses in Brazil, it operated exclusively in Brazil's unofficial

or "parallel" market.[4]  (Gusmao Decl. ¶ 20; Guerrero Dep. 105-06; Timm Dep. 128.)  Unlike the

situation in those countries in which such exchange houses were not visible and could therefore

---

[2] Prior to the sale, Vigo dealt exclusively with Vigo do Brasil Cambio e Turismo Ltda.,
Politiburo's predecessor.  (Gusmao Decl. ¶ 19; Tr. 47-48; cf. JE2.)  It appears that Vigo do
Brasil's name was changed to Politiburo Cambio e Turismo, Ltda. pursuant to the terms of the
parties' sale agreement.  (See JE10 at § 7.12.)  Whatever the cause for the change, however, for
ease of reference this Opinion uses "Politiburo" to refer to both the predecessor and successor
entities.

[3] Vigo's establishment of an exclusive relationship with Politiburo meant that Freire was
not only a 50% owner of Vigo, but also the owner of its exclusive correspondent in Brazil.  (Tr.
50.)

[4] The parallel market is a non-regulated foreign exchange market.  (Trujillo Dep. 68.)  In
general, parallel market exchange rates are better than official market exchange rates.  (Timm
Dep. 128; Tr. 76-77; cf. Trujillo Dep. 69-70; JE51 at 2-3.)  This phenomenon benefits money
transfer companies operating in the parallel market, and their customers as well.  (Timm Dep.
128-29; JE51 at 2-3.)  It is therefore no surprise that, during the time leading up to the sale of
Vigo, every money transfer service provider in Brazil except Western Union operated in the
parallel market.  (Guerrero Dep. 105-06, 133-34; JE14 at 5; cf. Gusmao Decl. ¶ 25.)

be deemed to be part of the "black market," however, at the time of the events giving rise to this

dispute exchange houses in Brazil's parallel market were highly visible, with parallel market

exchange rates often being quoted by the government, on Brazilian television, and in Brazilian

newspapers.[5]  (Gusmao Decl. ¶ 25; Timm Dep. 27, 97, 127-28, 136; Trujillo Dep. 68.)

19.    In early March 2003, Politiburo and Vigo entered into a contract formalizing their

exclusive relationship.  (Gusmao Decl. ¶¶ 22-23.)  The agreement, typical of those Vigo used

with correspondents in other countries (Gusmao Decl. ¶ 22; Tr. 74), was initially effective for

only one year, but would be

> automatically renewed for an additional one-year term
> commencing on the anniversary of [March 12, 2003, the date the
> agreement was signed,] unless either party ha[d] notified the other
> in writing, not less than 60 days before any such anniversary date,
> of its intention to cancel the agreement, whereupon the agreement
> [would] be terminated on the expiration of the term during which
> the notice was given.[6]

(JE28 § 8(a); see also Gusmao Decl. ¶ 22.)

20.    In addition to the automatic renewal provision, the agreement between Vigo and

Politiburo also contained a section entitled "Representations and Warranties of Correspondent"

that read as follows:

> Correspondent represents and warrants to Vigo that:

---

[5] Although Gusmao referred to Brazil's parallel exchange house market as a "black market" in a December 17, 2002, email to Trujillo (JE9), at trial Gusmao clarified that he makes no distinction between the terms "parallel market" and "black market."  (Tr. 40-41.)

[6] Gusmao testified that there were two agreements between Vigo and Politiburo, one dated January 9, 2003, and one dated March 12, 2003.  (Gusmao Decl. ¶ 23.)  According to him, both agreements were fully executed and are identical in all material respects.  (Id.)  However, the March 12, 2003, agreement "was issued because, during due diligence, defendants . . . wanted to receive all of the correspondent agreements, and [plaintiffs] had been unable to locate the January 9th agreement at the time."  (Id.)

8

(i)  <u>Corporate Existence and Power</u>.  Correspondent is a corporation duly organized, validly existing and in good standing under the laws of the Correspondent Payment County, and has all corporate powers and has all government licenses, authorizations, consents and approvals required to carry on its business as now conducted and as proposed to be conducted in Correspondent Payment County in accordance with this agreement. . . . Correspondent is authorized to effect money transmission payment to beneficiaries in Correspondent Payment Country in all locations wherein it conducts business and complies with all state and Correspondent Payment Country laws and regulations applicable to such transmission.

(JE28 § 5(b)(i); <u>see also</u> Gusmao Decl. ¶ 24.)

21.  While running Vigo, Gusmao never discussed with Freire or anyone else whether Politiburo possessed a license to engage in money transmission in Brazil, as his understanding was that there were no licensing procedures or requirements for money transmission in Brazil, just as there were no such procedures or requirements in many of the countries in which Vigo operated.  (Gusmao Decl. ¶ 26; <u>see also</u> Tr. 73-76.)  Gusmao instead relied on Politiburo's contractual representation that it was, in fact, in compliance with all legal or regulatory requirements applicable to money transmitters in Brazil.  (Tr. 61-62.)

**III.   The Sale of Vigo**

22.  Prior to March 31, 2003, plaintiffs owned 100% of Vigo's issued and outstanding shares of capital stock.  (JE47 at ¶ 9; JE48 at ¶ 9.)

23.  In 2001, Gusmao met Mario Trujillo and Roger Timm.  (Gusmao Decl. ¶ 28.) Trujillo informed Gusmao that he was looking to acquire a business, and was particularly interested in entering the money transfer industry.  (Gusmao Decl. ¶ 28; Trujillo Dep. 11-12.)  In light of this interest, Gusmao attended a few meetings with Trujillo and Timm.  (Gusmao Decl. ¶ 28.)  Although these meetings did not immediately lead to an agreement, Trujillo and Timm

9

contacted Gusmao one year later to inform him that they had acquired the proper financing and were prepared to move forward with an acquisition of Vigo. (Gusmao Decl. ¶ 29; cf. Trujillo Dep. 11.)

24.   Because other parties had also expressed interest in buying Vigo, and because he was bound by a non-disclosure agreement, Gusmao was unable to entertain Trujillo and Timm's renewed interest at the time they approached him.  (Gusmao Decl. ¶ 29.)  In mid-2002, however, after it became apparent that none of the interest expressed by other buyers would lead to a definitive agreement, Gusmao contacted Trujillo and made two trips to Boston to meet with various officials of Great Hill Partners, the organization that was expected to finance the acquisition.  (Gusmao Decl. ¶¶ 30, 32; Hayes Dep. 10-11; cf. Trujillo Dep. 12.)

25.   On May 24, 2002, the parties signed a letter of intent ("LOI") reflecting their agreement that Trujillo and his associates would acquire Vigo for $80,759,500.  (Gusmao Decl. ¶ 33; JE4; see also Trujillo Dep. 13-14.)  The LOI was negotiated largely by Gusmao and Trujillo, although Gusmao kept the Freire Brothers informed of the terms of the proposed sale, as well as the status of the deal after the LOI was signed.  (Gusmao Decl. ¶ 34; Trujillo Dep. 14.)  In addition to the purchase price, the LOI contemplated that Gusmao and the Freire Brothers would jointly receive a 5% share in GMT, though this share was later increased.  (Gusmao Decl. ¶ 33; Tr. 42; JE4 at 1.)  The LOI also provided for the establishment a $5 million escrow account, to be funded by money withheld from the purchase price, retained for three years, and released only after the occurrence of certain agreed-upon conditions.  (Gusmao Decl. ¶ 33; Tr. 42; JE4 at 1.)

26.   For approximately six months following the execution of the LOI, Trujillo and Timm conducted due diligence on Vigo.  (Gusmao Decl. ¶ 35; Trujillo Dep. 148-50.)  Trujillo, who

visited Vigo's New York headquarters nearly every day, was given office space near Gusmao so that his questions and concerns could be readily addressed.  (Gusmao Decl. ¶ 35; Trujillo Dep. 148-49.)  He was also afforded liberal access to Vigo personnel, documents, and customers.  (Gusmao Decl. ¶ 36; Trujillo Dep. 149-50.)  Through this process, Trujillo educated himself on numerous aspects of Vigo's business, including the countries in which Vigo operated and the countries to which it was contemplating expanding its service.  (Gusmao Decl. ¶ 36.)

27.  Although Timm was not in Vigo's offices with any regularity (Timm Dep. 14-15), he took specific responsibility for "the international side of the company, particularly the payers and all the related topics for those foreign payers."  (Timm Dep. 12.)

28.  During the course of this due diligence, in a meeting on June 4, 2002, Gusmao informed Timm that Lori Oppenheimer served as Vigo's independent compliance consultant.  (JE6 at MT 0033; cf. Trujillo Dep. 152.)  Oppenheimer, a former JP Morgan Chase compliance officer and attorney, monitored Vigo's compliance function, acted as an outsourced senior compliance officer, and conducted annual training of all Vigo personnel.  (JE6 at MT 0033; Tr. 57-58.)  Vigo also had an internal compliance officer who reported to Oppenheimer, among others.  (JE6 at MT 0036-37.)

29.  Several days after his meeting with Gusmao, Timm held a discussion with other Vigo personnel that prompted him to note that he "[n]eed[ed] to check out the legal structure of [Politiburo], is it a legally recognized exchange house?"  (JE6 at MT 0036.)

30.  Ultimately, before the closing of the transaction, both Trujillo and Timm learned that Politiburo was unlicensed[7] (Trujillo Dep. 172-73, 210; Timm Dep. 50; cf. Trujillo Dep. 175-76;

---

[7] In addition to their testimony that they knew for a fact that Politiburo was unlicensed, Trujillo and Timm also testified that they suspected that Politiburo was unlicensed.  (Trujillo

JE14 at 5), and that it operated in the parallel market.[8]  (Trujillo Dep. 173; Timm Dep. 27, 37-38, 135; cf. JE14 at 5.)

31.   In addition, based on information relayed by Gusmao, Trujillo learned that Vigo's Brazilian payor was related to the sellers in some manner.  (Trujillo Dep. 28, 31.)  Neither he nor anyone else at GMT, however, made anything more than a minimal effort to sort out this issue of ownership.  (Trujillo Dep. 31-32.)

32.   Prior to executing a final sale agreement, the parties adjusted the purchase price for Vigo downward to $76.5 million.[9]  (Gusmao Decl. ¶ 44; Trujillo Dep. 47-48; Tr. 42.)  This adjustment stemmed, at least in part, from certain losses the company experienced that quarter. (Gusmao Decl. ¶ 44.)  In particular, Vigo lost about 33% of its volume in Brazil during the few months preceding the adjustment.  (Gusmao Decl. ¶ 44; JE9.)  At that time, Western Union, which operated in Brazil's official market, provided services at a more favorable rate than Vigo. (Gusmao Decl. ¶ 44; JE9.)  When confronted by Trujillo about the matter, Gusmao explained to

---

Dep. 58-60, 125; Timm Dep. 97-98 (noting that his suspicion that Politiburo was not licensed in accordance with Brazilian law was based on the knowledge that Politiburo operated in the parallel market, as did all of Vigo's competitors); cf. Trujillo Dep. 158-59.)

[8] John Hayes, the founder and managing partner of Great Hill Partners, testified that he did not learn that Politiburo was unlicensed until after the closing.  (Hayes Dep. 7, 31-32, 34.) The Court, however, finds no inconsistency between this testimony and the testimony of Trujillo and Timm that they did, in fact, know that Politiburo was unlicensed prior to the closing.  As Hayes explicitly acknowledged that Trujillo advised him of Politiburo's licensing status (Hayes Dep. 34), it is entirely plausible that Trujillo discovered the relevant facts prior to closing but did not disclose those facts to Hayes until later.  This is particularly likely given that – prior to closing the transaction – GMT personnel did not believe that Politiburo's licensing status posed any problem from a legal standpoint.

[9] The purchase price was based at least in part on EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization).  (Tr. 44; Trujillo Dep. 14-15.)  Vigo's Brazilian operations, which represented 5.6% of its total revenue, were thus included in its total EBITDA. (Tr. 45.)

him that the losses were the result of the exchange rate on the official market surpassing the

exchange rate on the parallel market – a state of affairs that (to Gusmao's knowledge) had

existed only once before.[10]   (Gusmao Decl. ¶ 45; JE9; <u>see also</u> Timm Dep. 34-37.)

33.  On December 18, 2002, following their adjustment of the purchase price, the parties

entered into a formal sale agreement.  (Gusmao Decl. ¶ 46; JE10.)   The transaction closed on

March 31, 2003.  (Gusmao Decl. ¶ 49; JE47 at ¶ 11; JE48 at ¶ 11.)

34.  Less than three years after the closing, GMT re-sold Vigo to First Data Corp., the

then-parent company of Western Union, for approximately $352 million.  (Gusmao Decl. ¶ 50;

Tr. 43.)  At that time, plaintiffs' remaining stock interest in Vigo/GMT was liquidated.  (Gusmao

Decl. ¶ 50.)

## IV.   The Sale Agreement

35.  The December 18, 2002, Amended and Restated Stock Contribution Agreement (the

"Agreement") set forth the terms by which GMT would acquire Vigo.  (JE10.)

36.  Pursuant to the Agreement, in consideration of GMT's payment to plaintiffs of $76.5

million and 10% of GMT's common stock,[11] plaintiffs would turn over to GMT all of the issued

and outstanding shares of Vigo's capital stock.  (<u>Id</u>. at 1-2.)  In addition, $5 million of the

purchase price was to be held in escrow and released only upon the occurrence of certain

conditions, which included the absence of any claims for damages against the escrow.  (<u>Id</u>. §§

---

[10] As previously discussed, Gusmao used the term "black market" to refer to this
unofficial market.  (JE9.)

[11] The Agreement increased the percentage of stock to be issued to plaintiffs.  Whereas
plaintiffs originally would have shared a 5% interest in GMT's common stock (JE4 at 1), the
Agreement contemplated that Gusmao would receive a 5% interest in GMT's common stock, as
would the Freire Brothers.  (JE10 at 2.)

2.4(b)-(c), 2.7.)

37.  As sellers, plaintiffs warranted the "full compliance" of "[Vigo] and, to [plaintiffs']

Knowledge, each of [Vigo's] respective Affiliates and Representatives (other than the Agents or

the Correspondents)" with "(A) each Money Transmitter Law and each Legal Requirement

relating to immigration that is or was applicable to [Vigo] or to the conduct or operation of its

business or the ownership or use of any of its assets, including any requirement that [Vigo] enter

into an Agency Agreement with an Agent, and (B) each other Legal Requirement that is or was

applicable to [Vigo] or to the conduct or operation of its business or the ownership or use of any

of its assets, the noncompliance with which other Legal Requirement could reasonably be

expected to have a Material Adverse Effect."  (Id. § 3.14(a)(i).)

38.  Plaintiffs also warranted that "to [their] Knowledge, no . . . circumstance exist[ed]

that . . . (A) could reasonably be expected to constitute or result in a violation by [Vigo] of, or a

failure on the part of [Vigo] to comply with, any Money Transmitter Law or any Legal

Requirement relating to immigration, (B) could reasonably be expected to constitute or result in

a violation by [Vigo] of, or a failure on the part of [Vigo] to comply with, any other Legal

Requirement, which violation or failure could reasonably be expected to result in a Material

Adverse Effect, or (C) may give rise to any material obligation on the part of [Vigo] to

undertake, or to bear all or any portion of the cost of, any remedial action of any nature, except,

in each case, any Money Transmitter Law or Legal Requirement, the violation of which could

not reasonably [be] expected to result in a Material Adverse Effect."  (Id. § 3.14(a)(ii).)

39.  For purposes of these provisions, a "Legal Requirement" is "any federal, state, local,

municipal, foreign, international, multinational, or other administrative order, constitution, law,

ordinance, principle of common law, regulation, statute or treaty."  (Id. § 1.)

14

40.  Additionally, because Politiburo is a "foreign bank[] or other foreign Person[] or financial institution[] to which [Vigo] transmits money" (id. § 1), it is a correspondent within the meaning of the Agreement's defined terms.

41.  The representations and warranties embodied in Section 3.14(a)(i) and (ii) survived the closing (id. § 10.1), and – in the event of a breach – plaintiffs agreed that they would, jointly and severally, "indemnify and hold harmless [GMT] for, and [would] pay to [GMT] the amount of, any loss, liability, claim, damage (including incidental and consequential damages), or expense (including reasonable out-of-pocket costs of investigation and defense and reasonable attorneys' fees), whether or not [such breach] involve[d] a third-party claim."  (Id. § 10.2.)

42.  Pursuant to Section 10.1 of the Agreement, "[e]xcept as provided in Section 10.2(b) and 10.3(b), the right to indemnification, payment of Damages or other remedy based on . . . representations, warranties, covenants, and obligations [in the Agreement would] not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of th[e] Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or obligation."[12]  (Id. § 10.1.)

43.  In addition to the foregoing warranties and their related provisions, the Agreement also specified that Politiburo "shall have entered into an amendment of its Correspondent Agreement with [Vigo] on terms and conditions reasonably satisfactory to [GMT] to the effect that [Politiburo] will not exercise any right to terminate without cause or not to renew such

---

[12] Sections 10.2(b) and 10.3(b) except situations in which breach of a representation or warranty contained in the Agreement "result[s] from a condition, fact, circumstance or occurrence not existing or occurring on or prior to the date [of the Agreement]" that is subsequently disclosed in accordance with the Agreement's terms.  (JE10 §§ 10.2(b), 10.3(b).)

15

Correspondent Agreement for a period of one (1) year following the Closing Date."  (Id. § 7.15.)

**V.     Vigo's Post-Sale Operational Adjustments**

44.  When GMT's acquisition of Vigo became imminent, Trujillo and Timm hired Jorge

Guerrero, an American-trained lawyer admitted to practice in New York, Pennsylvania, and

Washington D.C., as Vigo's legal counsel and chief compliance officer.  (Tr. 104, 107.)

45.  Prior to joining Vigo, Guerrero spent four years with Marcovitch & Guerrero, a law

practice whose clientele included ten or fifteen money transfer companies.  (Tr. 104-105.)  After

leaving that practice, he became the founder and president of the National Money Transmitters

Association, a trade group representing the interests of money transmitters.  (Tr. 105, 108.)  He

eventually also founded a company called External Compliance Officer, Inc., which

"consolidate[d] data from money transfer companies so that [it] could comb through the data and

see if there was money laundering taking place, before those funds [were] deposited into banks."

(Tr. 105.)

46.  At the time Guerrero was hired, Trujillo and Timm informed him that "[t]hey wanted

to make sure that their compliance program at Vigo was the best that it could be.  And they

wanted to upgrade whatever existed [at Vigo]."  (Tr. 111.)  In addition, they noted that "they

wanted [Vigo] to be the poster child for compliance."  (Tr. 111.)

47.  From the time he joined the company in or about June 2003 until his departure in

August 2004, Guerrero held primary responsibility for "managing the compliance department,

and for enforcing the company's compliance program."  (Tr. 104.)

48.  When Guerrero arrived, Vigo had a compliance department of eight people, which

Guerrero admitted "was a good size for a company the size of Vigo."[13]  (Tr. 111.)  Guerrero also

acknowledged that the staff members themselves were "very skilled" and that the compliance

program as a whole was "good."  (Tr. 111.)  This assessment is consistent with the findings of an

independent consultant that, despite the existence of a few "areas that needed improvement"

prior to the change in Vigo's ownership, Vigo's compliance program was "good" and "strong."

(JE27 at 43.)

49.  Despite his favorable assessment of Vigo's compliance department, Guerrero was

charged with overseeing a number of "priority actions," one of which was reviewing all

licensing.  (Tr. 112; see also JE 18.)  In undertaking this review, Guerrero's goal was to identify

what Vigo was already doing and whether it was current with all applicable licensing

requirements.  (Tr. 112-113.)

50.  At the time Guerrero undertook the review, his understanding of federal law was that

a money transfer company had an obligation to ensure that all of its correspondents were

properly licensed, as determined by the laws of the countries in which they operated.  (Tr. 113.)

51.  Guerrero eventually focused on Vigo's Brazilian operations, after a number of

transactions involving that country revealed compliance issues.  (Tr. 116.)  In particular, there

were a number of transactions that involved "a somewhat larger amount than normal being

payable in Brazil and the client saying that the ultimate beneficiary hadn't received payment."

(Tr. 116:9-17.)

52.  The compliance review prompted by these suspicious transactions showed a number

---

[13] In addition to the compliance staff it employed, Vigo had generated a number of
compliance-related manuals, including an OFAC Policy and Procedure Guide and Bank Secrecy
Act and Anti-Money Laundering Procedures manuals.  (JE6 at MT 0037.)

of instances in which payment to the ultimate beneficiary was being made in U.S. dollars rather than Brazilian reais.  (Tr. 116-117.)  Having reached the conclusion that, as a matter of Brazilian law, it was inappropriate to make such payments in U.S. dollars, Guerrero instructed Vigo to terminate dollar service.  (Tr. 117-118.)

53.  Although Guerrero retained a Brazilian lawyer to help him assess the legality of the dollar payments, the information the Brazilian lawyer obtained was the same as the information Guerrero and his staff obtained by requesting that the company's Brazilian staff review the relevant documents, and by Guerrero reviewing certain of the documents himself.  (Tr. 119.)

54.  Vigo had determined that it would discontinue dollar payments in Brazil long before Guerrero conducted his compliance review and issued instructions to this effect, and indeed, before Guerrero's arrival at the company.  In its July 2003 monthly report, GMT stated that "[d]ue to issues with US dollar availability in Brazil, we have limited our dollar payments service to Brazil.  In addition, due to an uncertain regulatory issue with dollar payments in Brazil, we will terminate dollar service in September."[14]  (JE 21 at GH 0072.)  Consistent with this statement, in or around September 2003, GMT did in fact discontinue making dollar payments in Brazil.  (See, e.g., JE22; JE24 at 2; Trujillo Dep. 103.)

55.  In addition to inquiring into issues pertaining to dollar payments, Guerrero also made

---

[14]  It is clear that GMT knew of the risks associated with dollar payments before it issued the July 2003 monthly report, and even before the closing.  In January 2003, following a conversation with Freire, Trujillo informed Timm that Freire would "continue to do Dollar Payments in Brazil albeit somewhat limited, too much risk."  (JE12.)  Although Timm testified that Guerrero uncovered the problem of dollar payments and that the issue of such payments had not been raised prior to the closing (Timm Dep. 118), this testimony squarely contradicts contemporaneous documentary evidence demonstrating that GMT was well aware that dollar payments were being made in Brazil, and that such payments posed certain risks.  (See JE21 at GH 0072; JE12; JE14 at 5.)  This portion of Timm's testimony will therefore not be credited.

inquiries into the legality of other aspects of Vigo's operations.  In order to accomplish this task with respect to the roughly fifty countries in which Vigo operated, Guerrero issued letters to each of Vigo's correspondents, requesting proof of their compliance with all applicable licensing requirements or – in the alternative – documentation establishing that no such licensing requirements existed.  (Tr. 119-120.)

56.  Although Guerrero sent one of these letters to Politiburo (JE26), he received no response.  (Tr. 121-23; see also JE32.)  While Guerrero may have been surprised or alarmed by this outcome, others at GMT – like Trujillo – were not, as they knew that Politiburo was an unlicensed payor.  (Trujillo Dep. 199-200.)

57.  At the time he issued the letter to Politiburo, Guerrero also undertook an independent investigation to identify any licensing requirements applicable to money transmitters in Brazil.  (Tr. 122.)  He and another individual fluent in Portuguese conducted the investigation primarily through internet searches for relevant material.  (Id.)  Eventually, they uncovered a circular entitled Memorandum Number 2.677 (the "Circular") that Guerrero deemed applicable to money transfer services in Brazil.  (Id.)  Issued by the Central Bank of Brazil, the Circular had been in effect since 1996 and was not changed between the time of its enactment and Guerrero's discovery.  (Tr. 227; JE1.)

58.  Article 1 of the Circular memorializes a resolution "to determine that the deposit accounts . . . in national currency, in Brazil, of individuals or legal entities with domiciles or headquarters abroad must . . . be opened and operated exclusively in banks accredited to operate in the foreign currency market for floating exchange rates."  (JE1 (English Translation), at 1.)

59.  Although Guerrero had taken no classes, nor had he received any other formal training, in Brazilian law (Tr. 215), he interpreted the Circular – which was not an anti-money

19

laundering provision but a "currency control" (Tr. 124-25) – as requiring any entity making remittance payments in Brazil to be a bank so authorized by the Central Bank of Brazil.  (Tr. 123.)  In reaching this conclusion, Guerrero accorded the phrase "deposit accounts" a definition consistent with that given to the phrase in the context of U.S. banking relationships.  (Guerrero Dep. 104.)

60.  While Guerrero maintains that he received a letter from a Brazilian lawyer supporting his interpretation, there is no documentary evidence in the record to support this assertion, nor is there any testimony corroborating his interpretation from an attorney licensed to practice in Brazil or from a bona fide expert in Brazilian law.  (Tr. 128-130.)

61.  Guerrero's concern that Vigo's Brazilian operations were not in compliance with Brazilian law, and his determination to ensure that Vigo was well within the bounds of lawfulness, was reinforced by Beacon Hill, an investigation involving JPMorgan Chase and allegations of money laundering in Brazil.  (Guerrero Dep. 146-47.)  That investigation, which commenced after the parties' closing, increased the regulatory pressure on money transmitters. (Guerrero Dep. 145; Trujillo Dep. 68-69, 116; Timm Dep. 76.)

62.  In a March 4, 2004, memorandum, Guerrero recommended that Vigo terminate its relationship with Politiburo.  (JE31.)  In particular, he found that Politiburo's

> lack of confirmation of compliance [with Brazilian laws applicable
> to remittance payment services], compounded by the results of
> [Vigo's] assessment of risks presented by continued remittance
> services through Politiburo compel[led] a determination by the
> Compliance Department that immediately Vigo terminate
> remittance services to Brazil through this correspondent.

(JE 31 at MT 0057.)

63.  In addition to highlighting Vigo's unanswered request for proof of its

correspondent's licensing status and valid anti-money laundering program (see also Tr. 145-47),

Guerrero noted that

> it appears possible that payment of a substantial number of
> transactions in Brazil may be made to persons with expired CPF
> numbers, creating a risk that the address and identity of receivers
> may not be reliably established at the point of payment.  Vigo's
> compliance requirements demand that our correspondents be able
> to determine that the persons receiving payment are indeed the
> intended beneficiaries, and that, should questions arise concerning
> those transactions, we are able [to] ascertain with documents who
> sent the remittance and who received it.

(JE 31 at MT 0057-58.)  He then went on to note the "compliance issue of perception, if not

reality" created by Vigo's use of verified bank accounts of enterprises owned by Politiburo's

owners to settle payments owed by Vigo to Politiburo.  (JE31 at MT 0058.)  He reasoned that

"[m]aking payments to non-bank, third parties to reimburse a correspondent for its remittance

distribution services can appear to foster schemes such as the Black Market Peso Exchange, even

if the reality is otherwise, as it appears to be in this case.  Therefore, the practice itself exposes

Vigo to allegations that can harm its reputation, even if Vigo successfully fights the allegations."

(Id.)

64.  Guerrero's third and final justification for recommending that Vigo terminate its

relationship with Politiburo was the "marked increase in traits, patterns and amounts [of money

transmissions] that raise the level of concern about possible money laundering abuses."  (JE31 at

MT 0058.)  Ultimately, he concluded that "when viewed in the aggregate, each of the [described]

circumstances creates an environment that makes it untenable for Vigo to continue to make

remittance payments in Brazil through Politiburo."  (Id.)

65.  Although Guerrero's position was that – as of March 4, 2004 – the foregoing

findings rendered Vigo in violation of the PATRIOT Act, he undertook no review to determine

whether Vigo was in violation of any U.S. law prior to that time.  (Tr. 159-160.)  In fact, in investigating the practices and incidents that he contends produced these violations of law, Guerrero looked back no more than six months, as his focus in conducting his investigation was prospective, not retrospective.  (Tr. 149-150, 159.)  He therefore does not know whether any of the conditions that led him to recommend terminating Politiburo on March 4, 2004, existed as of March 31, 2003.  (Tr. 159-160.)

      66.  Guerrero's prospective approach is consistent with the view expressed by other GMT personnel that the regulatory shift requiring Vigo to validate the licensing status of its correspondents did not occur until after the closing.  According to Trujillo, although GMT knew that Politiburo was "unlicensed and operating in the parallel market" prior to closing, it "did not feel at that time that [it was] violating any U.S. laws that would require [it] to do more work."  (Trujillo Dep. 190.)  It was not until after the closing that "[t]he law changed" (Trujillo Dep. 116) and GMT understood that the direction of the regulatory environment was such that Vigo "[was] going to be responsible for validating [its] payors."  (Trujillo Dep. 96; see also id. 180 (noting that GMT "felt that . . . the law did not require [it] to validate [Politiburo's] license[.] . . . [T]hat came after [the parties] closed."); Timm Dep. 26 (noting that GMT did not believe that the failure to validate Politiburo subjected it to legal exposure prior to the closing), 130-31 (noting that GMT did not ask Politiburo for its license prior to the closing because the regulations requiring such validation "were just coming out or had not even come out yet").)

      67.  On March 8, 2004, Guerrero transmitted his memorandum to Trujillo and other GMT personnel.  (JE31 at MT 0056.)  Trujillo responded to this transmission on March 13, 2004, advising Guerrero to "please proceed to terminate the service as recommended."  (Id.)

      68.  By letter dated March 18, 2004, Vigo informed Politiburo that it would no longer use

Politiburo as its Brazilian correspondent.  (JE32.)  Vigo identified March 19, 2004 – the day it

faxed the letter to Politiburo – as the effective termination date.  (Id.)

69.  This termination occurred just over a month before Politiburo was to cease

operations of its own accord.  By letter dated February 27, 2004, Freire had advised Trujillo that

"effective April 30, 2004, [Politiburo would] cease to be Vigo's payee in Brazil."  (JE29.)  In

that letter, Freire also described the parties' longstanding agreement that Politiburo would be

phased out and new payees phased in:

> For over six months, we have had numerous meetings and one
> recurring topic, namely our intention of halting all operations in
> the remittance business because of a series of difficulties that
> cannot be overcome. . . .  You pleaded with us to please continue
> operating since you were about to close a deal with several
> Brazilian banks.  We both committed to a verbal agreement,
> believing that a written agreement wasn't necessary; we
> acquiesced to your wishes because it was never our intention to
> breach the service or hinder the operation.  We have just as much
> or even more vested interest in the success of Vigo Remittance
> Corp. and are fully aware of the negative implications disruption
> of service may cause.  However, the process of acquiring new bank
> payees in Brazil has taken longer than you have expected and has,
> therefore, delayed our own closing date.  You have expressed
> numerous times that April 2004 was when you would phase out
> operations with [Politiburo] and adopt the new system.  Once
> again[,] we will honor your request to maintain operations running
> thru [sic] April 30, 2004 and hope that this transition will be
> seamless and smooth.[15]

(Id.)

70.  As indicated by the letter,[16] GMT knew long before February 2004 that Politiburo

---

[15] Handwritten notations on a duplicate version of this letter suggest that the letter was
provided to Guerrero.  (JE30.)

[16] If taken for their truth, Freire's statements constitute hearsay.  However, because no
one at GMT disputed Freire's representations at the time they were made, the Court concludes
that the statements are admissible as statements the truth of which GMT has manifested an

desired to terminate its relationship with Vigo.  In fact, GMT negotiated Section 7.15 of the
Agreement precisely because it needed assurance that Vigo's sole Brazilian payor would not end
service before GMT could secure an alternate payor.  (Trujillo Dep. 50, 95, 184-86, 195-96;
Timm Dep. 79; cf. Trujillo Dep. 63 (noting that GMT "wanted to make sure that [Vigo] had at
least one year of that related-party agreement to be in place to protect [it], and I think we felt that
during that period of time if in fact we ha[d] problems in Brazil, either business or compliance,
we [could] replace the payor there with another one."); Trujillo Dep. 109 (noting that GMT
"encouraged [Politiburo] to continue operating until [Vigo] found a suitable solution").)

71.   In sum, long before Politiburo was terminated, it was well known that Politiburo no
longer desired to provide correspondent service for Vigo in Brazil.  (Timm Dep. 78, 80.)

72.   Vigo's new correspondent – Bradesco – commenced service through Bank of
America on March 15, 2004.  (JE33 at GH 0233, 0237.)

73.   As the near seamless transition from correspondent service through Politiburo to
correspondent service through Bradesco suggests, Vigo had retained Bradesco prior to notifying
Politiburo of the termination and contemplated change in service.   Its intent to establish this new
correspondent service dates as far back as the time of Vigo's sale.  A March 2003 Vigo
International Strategic Plan identifies "[r]estructur[ing] correspondent relationship away from
parallel market to licensed bank payers" as one of its "focused efforts" for its Brazilian
operations.  (JE14 at 2.)  A more in-depth discussion of this effort, and of the then-current
situation in Brazil, noted the following: "Distribution exclusivity with Ivan Freire, unlicensed
distributor, paying in local currency (real) and USDollars.  Operating through parallel market

---

adoption or belief in.  See Fed. R. Evid. 801(d)(2)(B).

24

outside highly regulated/bureaucratic exchange controls imposed by Brazil's Central Bank." (Id. at 5.)  In order to address the situation, the plan identified "re-directing business through regulated/licensed intermediary by 2/04" as one of its objectives.  (Id. at 6; see also Trujillo Dep. 172 (acknowledging that GMT's intention prior to closing was to move away from reliance on Politiburo and the parallel market and toward reliance on licensed banks), 175-76 (noting that GMT's intention prior to closing was to transition to licensed banks by February 2004); Timm Dep. 55 (same).)  The plan indicated that negotiations designed to accomplish this shift in service already were underway, as one of the issues it cited as critical was "BTS/Bancomer deliver[ing] on promised correspondent payer (expected to be largest private sector bank, Bradesco, which BBVA, Bancomer's parent, owns 4.5%)."  (JE14 at 6.)

74.  Thus, "prior to the closing, [GMT] had already keyed in on at least one potential replacement for Politiburo."  (Trujillo Dep. 179.)

75.  A separate document highlighting GMT's priorities for its "[f]irst 90 days" as Vigo's owner further demonstrates that GMT's long-held aim was to replace Politiburo, as two of the three priorities it identifies for Vigo's Brazilian operations are to hold "[m]eetings with Bradesco, Banco do Brasil, Banco Itau, and Credit Unions" and to "[i]dentify consultants/intermediaries to licensed payer and begin the process."  (JE15.)  This document is further corroborated by an April 23, 2003, status update in which GMT notes that Vigo "[n]eed[s] to get licensed payer status" in Brazil and identifies "Bradesco, Banco do Brasil, Banco Itau, [and] Credit Union" as potential payor options.[17]  (JE17 at GH 0132.)

---

[17] Timm contends that there was no reason to believe in May 2003 that Politiburo would be terminated.  (Timm Dep. 105.)  Rather, he maintains, GMT's efforts to contract with Brazilian payors was intended to supplement, not replace, service through Politiburo.  (Id. 116-17.)  As evidenced by the Findings of Fact outlined here, however, the weight of the evidence

76.    As indicated by GMT's July 2003 monthly report, the change in correspondent

service that Vigo sought was a decision driven, at least in part, by profit considerations.  In the

report, GMT asserted that "Brazil has been declining over the past several months and will

continue to decline until we have reached an agreement with a new payer allowing us to more

aggressively promote the service."  (JE21 at GH 0072.)  This assertion is consistent with the

sworn testimony in the record.  (Trujillo Dep. 95-96 (noting that in addition to licensing

considerations, GMT "had business reasons for wanting to change [Politiburo], only one payor

in the country, wasn't a bank, private party, related party. . . . [W]e didn't think it was a good

business risk, number one"); Timm Dep. 53-54 ("As part of an overall strategy, the company

was moving away from reliance on single payers and broadening the payer network that we had

at the time . . . ."), 72-73 (noting that "[t]he goal was to get multiple licensed payers" because

doing so would "give [the company] leverage to reduce costs, do marketing agreements, let the

existing country payers compete for the business, and broaden[] the portfolio of payers to reduce

the risk on any given one in any given country"), 89-91 (discussing a study conducted by Bank

of America that showed that customers would "benefit from the Bank of America service as

opposed to service through Politiburo"); Hayes Dep. 97 (noting that a "broad strategic goal of

the company" was "to replace the former Brazil correspondent with more than one payor"); cf.

Tr. 101-02.)

77.    Emails exchanged between various Vigo officials – Trujillo, Timm, and Guerrero

among them – demonstrate that by the fall of 2003, GMT was actively involved in negotiations

---

clearly contradicts this claim.  While not every piece of evidence of GMT's intent to switch to
payor service through a network of licensed banks explicitly notes that Politiburo will be
replaced, several do, and the remainder support the inference that GMT would be substituting
the new payors for Politiburo, not contracting with those payors in addition to Politiburo.

with Bank of America to achieve the desired changes in correspondent service.  (See JE 23.)

78.  According to an interoffice memorandum, "[o]n September 25, 2003, [Timm] received [a] proposal from Bank of America regarding changing [Vigo's] payer structure in Brazil.  While there [were] some pending issues/information needed from prospective payers, the offer [was] essentially complete and subject primarily to [GMT and Bank of America's] working out the operational details."  (JE25 at RT 0015.)

79.  Several months later, on February 5, 2004, Timm requested that Guerrero review the "Brazil payer agreement" with Politiburo and "look over relative to expiration, notice, etc.," as Vigo would "be moving out of Politiburo service to the BofA service to Brazilian banks very soon."  (JE28 at GMT00146.)  Although Guerrero did not "know about the specific dates," he did know that Vigo was "getting additional payers."  (Tr. 188.)  In addition, he acknowledged that, at the time Timm made this request, he understood Timm to be referring to "the payment to Bradesco through Bank of America."[18]  (Id.)

80.  By April 2, 2004, a business update generated by GMT identified "[i]mplementation of new Brazil [p]ayer" as one of Vigo's second quarter accomplishments, while categorizing "[t]ermination of incumbent Brazil payer" as one of its second quarter challenges.  (JE33 at GH 0232.)  The update subsequently elaborated on these developments, noting that "Bradesco service through BofA began 3/15[,] [m]onthly Brazil run rate at approximately 7.5K vs 18K for

---

[18] It is unclear to what extent Guerrero knew of GMT's plans to replace Politiburo. While he may not have known that GMT's goal was to replace Politiburo by February 2004, or that Politiburo itself intended to terminate service in April 2004 (Guerrero Dep. 120), such ignorance does not somehow undermine this documentary evidence of GMT's or Politiburo's expressed intentions.  Guerrero himself expressly acknowledged that from a compliance perspective, he often "put blinders on to the economic issues" (Guerrero Dep. 36) and would have had no reason to know of other reasons for terminating Politiburo.  (Guerrero Dep. 119.)

Jan/Feb[,] [c]urrently service problems, Banco do Brasil, Banco Itau, Unibanco being developed."  (JE33 at GH 0233.)

81.  After actually retaining Bradesco as its Brazilian correspondent, Vigo took steps to encourage regulators and other businesses involved in the money transfer industry to adopt its interpretation of the requirements for money transmission in Brazil.  (See, e.g., JE34.)  This was done to ensure that Vigo's competitors would not gain an unfair advantage over Vigo in the Brazilian market.  (Guerrero Dep. 77-78.)  As Guerrero testified, "I didn't want the company to be faced with an economic disadvantage in the industry and I wanted to make sure that any other companies that were paying remittance in Brazil knew of the requirement that they needed to have an authorized company or an authorized bank making payments in Brazil, and I also wanted to alert the regulators that did not know of the requirement."  (Guerrero Dep. 77.)

82.  On April 13, 2004, Guerrero issued an internal memorandum outlining his efforts "to ensure that regulators [were] aware of the requirement that in Brazil remittances must be paid through authorized banks."  (JE34 at GMT00412.)  According to the memorandum, Guerrero had met with members of the New York Banking Department to advise them of Vigo's "finding[] that only banks can process remittances in Brazil," announced at a meeting of the National Money Transmitters Association that "processing remittances through unlicensed correspondents was a violation of federal and some state laws," advised a member of the Massachusetts Banking Division "that Vigo was concerned that agents (all agents in MA) might try to circumvent the requirements because it was easier to conduct transactions illegally," and informed a compliance officer for money transmitters at JP Morgan Chase of the Brazilian requirements.  (Id. at GMT00412.)  Most of the parties Guerrero contacted – including the regulators – were unaware of the Brazilian regulation.  (See generally JE34; see also Guerrero

Dep. 148.)  Accordingly, Guerrero felt a particular responsibility to push regulators on the issue to ensure that they would take action to prevent any of Vigo's competitors from continuing to operate in Brazil's parallel market.  (Guerrero Dep. 170-71.)

83.  In the same memorandum, Guerrero noted that he would be "[r]equesting a written opinion from FinCEN as to the application of Sect. 312 of the USA Patriot Act to money transmitters.  Section 312 requires specific due diligence concerning correspondent relationships of banks.  On May 30, 2002, FinCEN intimated that [Section 312] also applies to any institution that requires a compliance program under Section 352.  Money transmitters require a compliance program under Section [352] of the Patriot Act."[19]  (JE34 at GMT00413.)

## CONCLUSIONS OF LAW

1.  The dispute between the parties centers on whether Vigo's use of a non-bank Brazilian correspondent violated any warranty contained in the parties' Agreement.  For the reasons set forth below, the Court concludes that defendants have not demonstrated any breach of warranty.

2.  Plaintiffs argue that the plain language of Section 3.14(a)(i) of the Agreement excludes from its coverage any conduct by Vigo's correspondents, including Politiburo.  (P. Post Tr. Mem. 2-3.)  Because Section 3.14(a)(i) expressly represents that "the Acquired Companies' respective Affiliates and Representatives (*other than the Agents or Correspondents*)" are in compliance with all applicable legal requirements (JE10, § 3.14(a)(i) (emphasis added)), it appears clear that plaintiffs did not warrant Politiburo's compliance with Brazilian law.  As

---

[19] FinCEN, the Financial Crimes Enforcement Network, is an agency of the United States Department of the Treasury whose mission is "to enhance U.S. national security, deter and detect criminal activity, and safeguard financial systems from abuse by promoting transparency in the U.S. and international financial systems."  See http://www.fincen.gov.

discussed in <u>Gusmao I</u>, this fact would not necessarily foreclose a finding that "Vigo's relationship with Polituburo violated federal law not because Polituburo violated Brazilian law, but because Vigo (via its use of Polituburo) operated through Brazil's black market."  2008 WL 2980039, at *8.  However, after a full review of the evidence, it is clear that GMT has failed to prove a violation by plaintiffs of any law, Brazilian or American.

3.  On October 26, 2001, the USA PATRIOT Act was signed into law.  Title III of the PATRIOT Act, entitled "International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001," includes certain amendments to the Bank Secrecy Act of 1970, 31 U.S.C. § 5311 et seq., designed to enhance the prevention, detection, and prosecution of international money laundering and terrorist financing.

4.  In particular, Section 352 of the PATRIOT Act requires every financial institution covered by the Bank Secrecy Act to establish an anti-money laundering program.  <u>See</u> 31 U.S.C. § 5318(h).  At a minimum, any such program must include: "(A) the development of internal policies, procedures, and controls; (B) the designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs."  <u>Id</u>.  (Tr. 161; <u>see</u> <u>also</u> Guerrero Dep. 134-35.)  In addition, pursuant to 31 C.F.R. § 103.125, an anti-money laundering program must be effective, or "reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," and "commensurate with the risks posed by the location and size of, and the nature and volume of the financial services provided by, the money services business."  31 C.F.R. § 103.125(a)-(b).

5.  It is undisputed that Vigo was subject to the Bank Secrecy Act,[20] as amended by the PATRIOT Act, and that at the time of the closing, Vigo was in compliance with the four minimum requirements for an anti-money laundering program set forth in Section 352.  (See Guerrero Dep. 134-35.)  When Guerrero arrived at Vigo, the company had an eight-person compliance program comprised of staff who Guerrero himself testified were "very skilled."  (Tr. 111.)  The program was run by Lori Oppenheimer, an independent compliance officer to whom Vigo's internal compliance officer reported.  (JE6 at MT 0033, 0036-37; cf. Trujillo Dep. 152.)  In addition, not only did the program provide for the training of Vigo employees, but it also provided for the creation and maintenance of various policy manuals pertaining to the Bank Secrecy Act and other anti-money laundering procedures.  (Tr. 57-58; JE6 at MT 0033, 0037.)

6.  GMT made no effort to demonstrate that these practices were ineffective or otherwise insufficient to satisfy the four basic anti-money laundering requirements of the PATRIOT Act.  However, it claims that Vigo was in violation of additional provisions of the Act.  According to GMT, in addition to establishing minimum standards for anti-money laundering programs, Section 352 required Vigo to verify the licensing status of its foreign correspondents and whether those correspondents took steps to implement anti-money laundering programs of their own.  (GMT Post-Tr. Mem. 3, 9-10.)  GMT further contends that similar due diligence requirements existed pursuant to Section 312 of the PATRIOT Act.  Contrary to GMT's position, however, any argument that Vigo violated U.S. law when it failed to verify Politiburo's licensing status or adoption of an anti-money laundering program is unsupported by the law as it

---

[20] The Bank Secrecy Act applies to various categories of financial institutions, including money services businesses.  See 31 U.S.C. § 5312(a)(2)(R).  Money services businesses, in turn, include a number of non-bank financial institutions, including money transmitters.  See 31 C.F.R. § 103.11(uu)(5).

existed at the time of the closing.

7.  Neither Section 312 nor Section 352 of the PATRIOT Act makes any reference to the licensing of foreign correspondents of money transmitters.  Nor does 31 C.F.R. § 103.125 – the implementing regulation for Section 352 – expressly obligate a money transmitter to verify the licensing status of its foreign correspondents or their implementation of anti-money laundering programs.  The statute and regulation do require, in a general way, that companies such as Vigo maintain "effective" anti-money laundering programs.  However, the contents of a program that satisfies this requirement no doubt evolve over time, as the industry's – and its regulators' – understanding of best practices for avoiding the exploitation of financial institutions by terrorists and other criminals develops.  This emerging and evolving understanding is best reflected in the administrative guidance offered by government officials with respect to the due diligence obligation of financial institutions.  Thus, in order to determine how best to interpret the obligations embodied in Section 352 of the PATRIOT Act, and – particularly – whether that section imposed any due diligence requirements on money transmitters as of March 31, 2003 – it is useful to analyze the implementation of Section 312 of the PATRIOT Act, which requires financial institutions that establish, maintain, administer, or manage correspondent accounts in the United States for non-U.S. persons to adopt anti-money laundering due diligence measures with respect to those accounts.  See 31 U.S.C. § 5318(i).

8.  On May 30, 2002, Treasury and FinCEN issued a notice of proposed rulemaking for a rule that would "require[] covered financial institutions . . . to implement programs to ensure that the due diligence requirements of [Section 312 of the PATRIOT] Act are met."  67 Fed. Reg. 37736, 37737 (May 30, 2002).  For purposes of the proposed rule, covered financial institutions included money services businesses, and correspondent accounts included any "account

established to receive deposits from, make payments on behalf of a foreign financial institution,

or handle other financial transactions related to such institution." Id. at 37737-38.  A foreign

financial institution, in turn, would include any entity "organized under foreign (non-U.S.) law

. . . that, if . . . organized in the U.S., would fall within the proposed definition of covered

financial institution[, including] . . . money services businesses." Id. at 37738.

    9.  On July 23, 2002, however, Treasury and FinCEN reversed course.  Exercising their

authority under Section 5318(a)(6) of the Bank Secrecy Act, they "temporarily defer[red] the

application of all requirements contained in [the May 30, 2002, proposed rule] . . . to . . . money

services businesses."  67 Fed. Reg. 48348, 48351 (July 23, 2002).  In support of their decision,

Treasury and FinCEN noted that:

> A final rule implementing section 312 cannot reasonably be
> completed by the statutory effective date of July 23, 2002.
> Without question, the proposed rule implementing section 312 is
> the furthest reaching proposed regulation issued under Title III of
> the Act thus far.  The requirements placed on financial institutions
> under this provision are significant, and commenters have raised
> substantial and important concerns about the scope of the
> regulation as well as the major definitions applicable to this
> section.  For example, commenters consistently noted that the
> definitions of "correspondent account," "covered financial
> institution," and "foreign financial institution," were overly broad
> and difficult to implement. . . .   Additional time is necessary to
> consider carefully these definitions and the text of the proposed
> rule in light of comments received to determine whether these
> terms should be further defined with respect to each financial
> institution.
>
> . . .
>
> Although section 312 is self-executing, in the absence of a final
> rule, many classes of financial institutions, in particular, non-bank
> financial institutions would not have clear notice of, or guidance
> regarding, their compliance obligations.  More pointedly, without
> regulations defining key terms for financial institutions other than
> banks, these financial institutions would not have sufficient

33

> guidance to comply with all facets of section 312. . . .  Without
> clarifying appropriate terms for the various industries, enforcement
> of [the proposed rule] against the full range of financial institutions
> proposed to be covered by section 312 will be difficult.  Therefore,
> deferral is necessary and appropriate.
>
> Nor would it be appropriate for Treasury to insist on compliance
> with the terms of the proposed rule pending the completion of a
> final rule.  We are still reviewing and analyzing the comments
> received and formulating the terms and scope of the final rule.
> Were Treasury to require strict compliance with the proposed rule,
> not only would it undermine the administrative process, but also it
> might require financial institutions to incur substantial costs to
> comply with provisions of the proposed rule that may be altered or
> eliminated.  Without suggesting that such changes will be made,
> such a result is untenable.

Id. at 48349.

10.  Although the July 23, 2002, interim final rule cautioned that the "temporary deferral does not in any way relieve any financial institution from compliance with the existing anti-money laundering and anti-terrorism requirements imposed by law, regulation, or rule of a self-regulatory organization," and that "Treasury and FinCEN expect financial institutions proposed to be subject to the regulation implementing section 312 to begin immediately the process of evaluating their due diligence procedures when correspondent accounts or private banking accounts are opened or maintained on behalf of non-U.S. persons," id. at 48351, the clear message conveyed by the interim final rule was that "strict compliance with the proposed rule" would not be required until after Treasury and FinCEN considered the concerns voiced over the scope of the provision and the lack of sufficiently clear guidance needed for proper compliance. Id. at 48349.  Indeed, the interim final rule expressly stated that "[p]ending issuance of a final rule, Treasury expects compliance with section [312] as set forth below.  Treasury does not expect compliance with the terms and conditions of the proposed rule except to the extent they

34

coincide with *the express requirements of the statute*."  Id. at 48350 (emphasis added).  Thus, while Treasury and FinCEN did encourage financial institutions like money transmitters to begin reviewing the adequacy of their due diligence procedures, conducting such a review was a suggestion, not an obligation.  A money transmitter's failure to adopt due diligence procedures, or to change any such preexisting procedures, would not have violated any law.  Id. at 48350-51.

11.  The July 2002 interim final rule remained in effect until publication of the final rule on January 4, 2006.  The final rule made permanent FinCEN's decision "to limit the scope of covered financial institutions to those institutions that [it] believe[d] offer[ed] correspondent services to foreign financial institutions. . . .  Those not covered by the rule include[d] . . . money services businesses."  71 Fed. Reg. 496, 498 (Jan. 4, 2006).  In support of this decision, FinCEN reasoned:

> With respect to money transmitters, we have determined that money transmitters' methods of operation and the attendant risks with respect to foreign financial institutions and their customers differ sufficiently from the concept and definition of a correspondent account envisioned by the statute and this rule that their inclusion would not achieve the desired result.
>
> . . .
>
> We recognize that criminals and terrorists might be able to use money transmitters to move money through the United States, and that it is imperative that money transmitters conduct due diligence on their foreign counterparties to enable them to perform the appropriate level of suspicious activity and risk monitoring.  However, we have addressed this risk separately through the issuance of specific guidance . . . .
>
> We believe that the obligation for a money transmitter to know its foreign counterparties . . . is a part of each money transmitter's obligation to have appropriate policies, procedures and internal controls to guard against money laundering and the financing of terrorist activities and to report suspicious activities.  To further delineate these obligations, on December [14], 2004, we issued

> Interpretive Release No. 2004-1, which addressed the due
> diligence obligations of a money transmitter with regard to its
> foreign counterparties/agents.  This interpretative rule was issued
> to ensure that money transmitters place appropriate controls on
> cross-border relationships without attempting to force the
> relationship to fit within this rule relating to correspondent
> accounts.

Id. at 500 (footnote omitted).[21]

12.   Both the interim rule and the final rule make clear that while Vigo may have been well-advised to conduct the due diligence on Politiburo's licensing status that GMT contends was legally required, its failure to do would not have violated Section 312.  The question remains, however, whether the failure to do so would nevertheless have violated Section 352.  The Court concludes that – at the time of the closing – Vigo's failure to conduct due diligence on Politiburo's licensing status would not have violated Section 352.

13.   As the 2006 FinCEN regulation recognized, the principal guidance issued to money transmitters about their PATRIOT Act obligations was issued in December 2004.  In particular, on December 14, 2004, FinCEN issued an interpretive release advising that a Section 352-compliant anti-money laundering program should include procedures for conducting due diligence on foreign correspondents.  See generally 69 Fed. Reg. 74439 (Dec. 14, 2004).  In particular, the release stated:

> Money Services Businesses should establish procedures for
> conducting reasonable, risk-based due diligence on potential and
> existing foreign agents and counterparties to help ensure that such
> foreign agents and counterparties are not themselves complicit in
> illegal activity involving the Money Services Business' products
> and services, and that they have in place appropriate anti-money

---

[21] Although the final rule cites December 4, 2004, as the date on which Interpretive Release No. 2004-1 was issued, the release was actually issued on December 14, 2004.  See 69 Fed. Reg. 74439.

laundering controls to guard against the abuse of the Money
Services Business' products and services.  Such due diligence
must, at a minimum, include reasonable procedures to identify the
owners of the Money Services Business' foreign agents and
counterparties, as well as to evaluate, on an ongoing basis, the
operations of those foreign agents and counterparties and their
implementation of policies, procedures, and controls reasonably
designed to help assure that the Money Services Business'
products and services are not subject to abuse by the foreign
agent's or counterparty's customers, employees, or contractors.
The extent of the due diligence required will depend on a variety
of factors specific to each agent or counterparty.  We expect
Money Services Businesses to assess such risks and perform due
diligence in a manner consistent with that risk, in light of the
availability of information.

Id. at 74441 (footnote omitted).

14.  The release also identified some, but not all, of the risks that may be taken into

account when developing the type of risk-based anti-money laundering program contemplated

by 31 C.F.R. § 103.125.  These risks included, inter alia, the foreign correspondent's location

and jurisdiction, and "the extent to which the relevant jurisdiction is internationally recognized

as presenting a greater risk for money laundering or is considered to have more robust anti-

money laundering standards," as well as the correspondent's ownership, including "whether the

owners are known, upon reasonable inquiry, to be associated with criminal conduct or

terrorism."[22]  Id.

---

[22] GMT cites this language in support of its claim that plaintiffs violated Section 352 by
failing to terminate or otherwise adjust Vigo's relationship with Politiburo once they learned that
Politiburo's owner was under criminal investigation.  (See GMT Post-Tr. Mem. 5, 8-10; see also
Tr. 65-66.)  This argument is meritless.  Gusmao's unrefuted testimony is that the criminal
investigation had absolutely no relation to Vigo's business with Politiburo.  (Tr. 66, 100-01.)  As
the express purpose of identifying a foreign counterparty's ownership is to "ensure that such . . .
counterparties *are not themselves complicit in illegal activity involving the Money Services
Business' products and services*, and that they have in place appropriate anti-money laundering
controls to guard against the abuse of the Money Services Business' products and services," 69
Fed. Reg. at 74441 (emphasis added), there is no basis for concluding that charges lodged

37

15.   Although the December 2004 release was the first explicit instruction to money transmitters concerning their due diligence obligations regarding correspondents, GMT argues that such due diligence has always been a fundamental part of a money transmitter's obligation to maintain an effective anti-money laundering program.   In support of this argument, it notes that "[i]n denying Plaintiffs' second motion for summary judgment, this Court explicitly held that the FinCEN guidance did not 'purport to establish new law,' but merely clarified what was already an 'essential part' of a money transmitter's '*existing obligation* . . . to develop and implement an effective anti-money laundering program' with respect to the transmitter's relationship with 'foreign agents and counterparties.'" (Id. 9 (emphasis in original), quoting Gusmao I, 2008 WL 2980039, at *7.)

16.   On summary judgment, this Court declined to rule that – as a matter of law – the interpretive release was inapposite simply because it was "promulgated long after the deal closed and constitut[ed] the very first authority addressing operations with an unauthorized foreign correspondent as a . . . violation of the applicable federal statute." Gusmao I, 2008 WL 2980039, at *7 (internal quotation omitted).   In light of the text of the interpretive guidance and the regulatory history surrounding implementation of Title III of the PATRIOT Act, however, the Court concludes that GMT has failed to demonstrate any violation of Section 352 by plaintiffs.

17.   In promulgating the interim rule implementing Section 312, FinCEN expressly acknowledged that requiring a financial institution to conduct due diligence on its foreign counterparties would constitute "the furthest reaching proposed regulation issued under Title III

---

against Freire – and not Politiburo itself – render plaintiffs' use of Politiburo as Vigo's Brazilian payor unlawful.

of the [PATRIOT] Act thus far."  67 Fed. Reg. at 48349.  In light of this fact and the subsequent

finding that the requirement to conduct such due diligence was "significant," FinCEN thought it

wise to refrain from applying the requirement to money transmitters – among others – until it

could provide them (and other subject financial institutions) with "clear notice of, or guidance

regarding, their compliance obligations."  Id.  To the extent that money transmitters did not have

sufficient "notice of, or guidance regarding, their compliance obligations" under Section 312, it

is difficult to conclude that they would have had such notice and guidance of the very same

obligations under Section 352.  There does not appear to be any material difference between the

due diligence requirements set forth in Section 312 and those set forth in the December 2004

interpretive guidance for Section 352.  Indeed, prior to the issuance of the interpretive release

and the January 2006 final rule implementing Section 312, the due diligence requirements were

one and the same.  Although FinCEN expressed its view that a money transmitter had an

"obligation . . . to know its foreign counterparties," it acknowledged that the content of this

obligation was vague when it noted that the purpose of the December 2004 interpretive release

was "[t]o further delineate [that] obligation[] . . . [and] to ensure that money transmitters place

appropriate controls on cross-border relationships without attempting to force the relationship to

fit within th[e] rule relating to correspondent accounts."  71 Fed. Reg. at 500.

  18.  Even assuming that the requirements set forth in the December 2004 interpretive

release were an essential part of Section 352 from its inception, the text of the release does not

compel the conclusion that Vigo's failure to verify Politiburo's licensing status constitutes a

violation of Section 352.  To the contrary, the due diligence requirements outlined in the release

prescribe multi-factored, context-dependent inquiries that necessarily entail a money

transmitter's exercise of discretion based on its assessment of the risks presented by a particular

foreign affiliate.  These context-dependent standards are consistent with Guerrero's admission that violations of applicable anti-money laundering laws were not established by reference to any "hard and fast rule[s]," but instead were the result of "interpretation by both the regulators and more importantly the law enforcement."  (Tr. 162.)  A company cited for a potential anti-money laundering violation could therefore defend against such a charge not only by cooperating with investigators, but also by demonstrating that – on the whole – it employed adequate controls, even if a particular transaction may have slipped through the cracks.  (Tr. 162-64.)  Moreover, nowhere does the interpretive release suggest that a money transmitter violates Section 352 simply because it is engaged with an "unlicensed" foreign agent or counterparty.

19.  The fluid nature of the regulatory requirement in general – and the specific absence, as of March 2003, of any definite requirement that U.S. money transmitters assure themselves that their foreign correspondents were in full compliance with all licensing laws in their own countries – is further demonstrated by Guerrero's efforts, upon concluding that GMT should terminate Politiburo for its lack of a license – to persuade others in the industry, not to mention the regulators themselves, that such a requirement existed.  Guerrero testified that most of Vigo's competitors operated in the parallel market in Brazil in March 2003, and that he had to undertake to persuade them, and the regulators, that this was inappropriate, so that GMT would not be at a competitive disadvantage.  (Guerrero Dep. 77-78, 105-06, 133-34, 170-71; see also JE34.)  His conclusions evidently came as news to both the industry and to regulators.  (Guerrero Dep. 148; JE34.)  To the extent he convinced anyone, it does not appear that the regulators ever issued any instruction to money transmitters operating in Brazil as to the nature of their correspondents.  As noted above, when in December 2004 FinCEN finally provided guidance to money transmitters requiring due diligence with respect to their correspondents, no reference

40

was made to their compliance with local licensing laws.

20.   Even if U.S. law did require money transmitters to deal only with locally licensed foreign counterparties, GMT has failed to prove that Politiburo's operations ran afoul of Brazilian law.  In its attempt to make such a showing, GMT cites the Brazilian Central Bank Circular entitled Memorandum Number 2.677.  (JE1.)  Although the Circular states that "deposit accounts . . . in national currency, in Brazil, of individuals or legal entities with domiciles or headquarters abroad must . . . be opened and operated exclusively in banks accredited to operate in the foreign currency market for floating exchange rates" (id. (English Translation), at 1), it does not define the term "deposit accounts."  While Guerrero testified that according to his understanding of the Circular's import, Politiburo's operation violated Brazilian law because Politiburo was not an accredited bank, Guerrero admitted that he simply assumed that the meaning to be accorded "deposit accounts" is the meaning carried by that term in the American banking context.  (Guerrero Dep. 104.)

21.   Given Guerrero's complete lack of training in Brazilian law (Tr. 215), and GMT's failure to offer any corroborating testimony from an expert qualified to opine on issues of Brazilian law (Tr. 128-30), Guerrero's testimony is an insufficient basis upon which to conclude that Politiburo actually violated Brazilian law.  This is particularly so given that, at all relevant times, every money transmitter in Brazil except Western Union operated in the parallel market.  (Guerrero Dep. 105-06, 133-34; JE14 at 5; cf. Gusmao Decl. ¶ 25.)  Unlike a true black market, the parallel exchange market was highly visible, with rates routinely being quoted on Brazilian television and published in newspapers and other government publications.  (Gusmao Decl. ¶ 25; Timm Dep. 27, 97, 127-28, 136; Trujillo Dep. 68.)  Perhaps even more importantly, GMT has offered no evidence that, during the eight-year period between the enactment of the Circular and

Guerrero's determination that the parallel exchange market was illegal under Brazilian law (see Tr. 227; JE1), Brazilian authorities ever prosecuted, or expressed an intent to prosecute, civilly or criminally, any person or institution for the conduct GMT complains was illegal in Brazil.

22. While GMT emphasizes that Rule 44.1 of the Federal Rules of Civil Procedure states that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence," the language in the provision is manifestly permissive, not mandatory. Thus, when presented with "any relevant material or source," the Court retains discretion to determine whether to rely upon that material or source in resolving open questions of foreign law. Aside from the Circular, the proper interpretation of which has not been sufficiently proven, GMT offers no other evidence to suggest that Politiburo lacked proper licensing status under Brazilian law. For the reasons already stated, the Court thinks it unwise to resolve this issue of foreign law in the manner advocated by GMT on the basis of such a thin record.

23. Guerrero's testimony concerning his approach to compliance, the characterization of the Brazilian regulatory environment by GMT personnel as uncertain (see, e.g., Timm Dep. 16, 65-66), and GMT's attempts to persuade other individuals and associations affiliated with the money transfer industry – particularly regulators – of its interpretation of the law (see, e.g., JE34) only bolster the conclusion that GMT has failed to show any actual violation of the law by Vigo at the time of its sale. Indeed, these efforts make clear that GMT understood that it was well ahead of the regulatory curve and that it would be in its financial interest to ensure that other money transfer companies stopped engaging in activity that it had concluded ran afoul of the law. Failure to do so would place GMT at a competitive disadvantage. (Tr. 173, 224-25.)

24. Not only did Guerrero acknowledge that his March 4, 2004, memorandum

recommending termination of Politiburo was based on a prospective examination of Vigo's compliance with applicable laws rather than an assessment of how Vigo operated on or before the March 31, 2003, closing (Tr. 149-50, 159-60), but he also made clear that far from simply complying with the letter of the law, his approach to compliance was to "steer very clear of even the possibility of a violation of law." (Tr. 141.) As he explained, "the issue for me was I [didn't] want to get into a situation where I ha[d] to defend what [we were] doing anywhere, because the moment that Vigo [came] out in a newspaper article, associated with anything related to money laundering, we [would] have no bank accounts. And without bank accounts, we [would] have no business." (Tr. 140.) This conservative approach is reflected in Guerrero's concern with "compliance issue[s] of perception," not simply those which were realities.[23] (JE31 at MT 0058; see also id. ("Making payments to non-bank, third parties to reimburse a correspondent for its remittance distribution services *can appear* to foster schemes such as the Black Market Peso Exchange, *even if the reality is otherwise, as it appears to be in this case*. Therefore, the practice itself exposes Vigo to allegations that can harm its reputation, even if Vigo successfully fights the allegations.") (emphasis added).)

    25. Even if the Court agreed that the meaning of "deposit accounts" as used in the

---

[23] Guerrero's attitude toward compliance is entirely commendable, and the Court implies no criticism of his approach, which both decreases the risk of money laundering or other illegal activity, and protects his client or employer from embarrassment and other business risks. The point is simply that Guerrero's conclusion that GMT would be well advised to conduct business in Brazil in a particular manner, so as to avoid the slightest risk of violating, or even being accused of violating, Brazilian or U.S. law, is not an adequate basis to find that Vigo was in violation of the PATRIOT Act, and therefore in breach of its warranties to GMT, when it conducted its Brazilian business in a different way, as did nearly all of its competitors, without interference or questioning by either U.S. or Brazilian authorities. Guerrero's reading of Brazilian bank regulations may have been prudent, or even, in some theoretical sense, "correct," but it is not a sufficient basis for the Court to find that Vigo was, in 2003, in violation of extremely vague, imprecise, and evolving federal law.

Circular mirrors the meaning of "deposit accounts" as used in American banking contexts, GMT still would not have proven a violation sufficient to support its claim for breach of warranty. It is undisputed that the Circular is a currency control, not an anti-money laundering provision. (Tr. 124-25.) Accordingly, it is not at all clear that money laundering is necessarily facilitated when one operates through channels subversive of Brazilian currency controls but otherwise maintains appropriate records and operates via channels that are sufficiently open and notorious to prevent the transfer of large amounts of cash without triggering the proper notifications and/or warnings. As noted above, plaintiffs expressly did not covenant that Vigo's correspondents were in full compliance with local law. GMT's theory is thus that Vigo itself violated U.S. law – the PATRIOT Act – by failing to engage in adequate anti-money laundering due diligence regarding its Brazilian correspondent. However, that correspondent's violation of a widely-ignored (if extant at all) Brazilian currency control regulation falls well short of proving a violation of the PATRIOT Act's anti-money laundering provisions.

26. For the foregoing reasons, GMT has not demonstrated that Vigo failed to comply with any applicable law at the time of its sale.

27. Finally, even assuming Vigo was in violation of Section 352 of the PATRIOT Act, and that that violation constitutes a breach of Section 3.14(a)(i) and (ii), GMT has not established that its damages are attributable to plaintiffs' breach. Although GMT argues that it was forced to terminate Politiburo in order to comply with U.S. law requiring it to verify Politiburo's licensing status, the evidence makes clear that GMT had already resolved to end Vigo's relationship with Politiburo long before Guerrero recommended that the relationship be terminated for compliance reasons. (Trujillo Dep. 172, 175-76; Timm Dep. 55; JE14 at 2, 5-6; JE15; JE 17 at GH 0132; JE23; JE25 at RT 0015; JE28 at GMT00146.) In particular, GMT

44

determined prior to the closing that Vigo would end its relationship with Politiburo by February 2004.  (JE14 at 6; Trujillo Dep. 175-76.)

28.  In light of this determination, GMT sought and obtained a contractual provision (JE10 § 7.15) that would obligate Politiburo to continue as Vigo's correspondent for one year after the closing so that GMT would have sufficient time to implement its planned service changes. (Trujillo Dep. 50, 95, 184-86, 195-96; Timm Dep. 79.)

29.  Far from being the product of concerns relating to compliance, this intended change in payor service stemmed from GMT's unease with the related ownership of Vigo and Politiburo, and its desire to improve business (i.e., increase profit) in Brazil by shifting to a multi-payor system reliant on banks.  (Trujillo Dep. 95-96; JE21 at GH 0072; Timm Dep. 53-54, 72-73, 89-91; Hayes Dep. 97.)

30.  Consistent with GMT's expressed intent, it terminated Vigo's relationship with Politiburo in March 2004.  Although this termination occurred one month later than the date GMT initially identified as its goal, neither that fact nor Guerrero's recommendation that GMT terminate Politiburo for compliance reasons compels the conclusion that the termination was not the result of GMT's voluntary action.  The delay in terminating Politiburo is consistent with the testimony of GMT personnel, who noted that securing alternate payors in Brazil took longer than expected.  (Trujillo Dep. 196; Timm Dep. 80.)  In addition, whatever Guerrero's motivations for recommending Politiburo's termination, plaintiffs have adequately shown that GMT's decision to discontinue its relationship with Politiburo predated that recommendation and thus would have occurred whether or not Guerrero ultimately identified compliance issues that he believed

warranted a change in payors.[24]

31.  That GMT's strategy proved less successful than it anticipated does not now permit it to cite Vigo's failure to verify Politiburo's licensing status as the source of its loss.  GMT intended to terminate Vigo's relationship with Politiburo for reasons independent of Vigo's compliance with applicable law and, whatever the impact on Vigo's bottom line, this is precisely what GMT achieved.

32.  The conclusion is no different with respect to the issue of dollar payments.  Long before Guerrero ever recommended that Vigo terminate dollar payments in Brazil, GMT knew that such payments were being made and that those payments posed certain risks.  In January 2003, Trujillo reported that Freire would continue to make dollar payments, albeit on a more limited basis given the related risks.  (JE12.)  Several months later, in July 2003, GMT's monthly report advised that because of the "uncertain" regulatory environment with respect to dollar payments, the company would discontinue such payments in September of that year.  (JE 21 at GH 0072.)  In light of these facts, the Court rejects any claim that Guerrero's post-sale compliance review caused the termination of dollar payments.  GMT had full knowledge of the existence of dollar payments and their related risks well before the closing of the parties' transaction, and its decision to terminate such payments was prompted not by Guerrero's determination that such payments were unlawful, but by its own determination that the

---

[24] That Guerrero may not have been privy to these plans and therefore may have believed his recommendation to be the cause of GMT's termination of Vigo's correspondent relationship with Politiburo has no bearing on whether his recommendation was actually the cause of GMT's termination of the relationship.  The Court finds it doubtful that Guerrero was entirely ignorant of GMT's preexisting plans to change its payor service in Brazil.  However, even assuming Guerrero had no knowledge of GMT's intent to relieve Politiburo, this lack of knowledge does not in any way alter the conclusions outlined in this Opinion.

regulatory environment surrounding such payments was "uncertain."[25]  (Id.)

33. As the Court has found no violation of law sufficient to support GMT's claims for breach of warranty, it need not address plaintiff's remaining defenses or any issue pertaining to damages.

### CONCLUSION

Because GMT has failed to demonstrate that plaintiffs were in violation of any law at the time of Vigo's sale, its claim for breach of warranty – and any related rights of indemnification – must be rejected.  Accordingly, judgment shall be entered in favor of the plaintiffs, and GMT is directed to release all funds remaining in escrow to plaintiffs.

SO ORDERED.

Dated: New York, New York
     April 30, 2009

                                          GERARD E. LYNCH
                                     United States District Judge

---

[25] It should be noted that even if Guerrero's recommendation had been the cause of GMT's decision to terminate dollar payments, GMT has not identified any rule or regulation purporting to prohibit such payments.  Accordingly, GMT cannot establish that the practice of dollar payments in Brazil violated federal law so as to constitute a breach of the warranties in the Sale Agreement.

47